[No. 47265-3. En Banc. October 29, 1981.]

THE STATE OF WASHINGTON, *Respondent,* v. HERMAN DONALD HARTZOG, *Petitioner.*

385

*Wayne Lieb* of *Institutional Legal Services* and *Craig J. Davenport,* for petitioner.

*Arthur R. Eggers, Prosecuting Attorney,* for respondent.

WILLIAMS, J.—Petitioner Hartzog challenges the constitutionality of a security order applicable to all defendants and witnesses who are penitentiary inmates and who come before the Walla Walla Superior Court. He also seeks reversal of that portion of a Court of Appeals decision upholding his conviction for possession of a controlled substance. *State v. Hartzog,* 26 Wn. App. 576, 615 P.2d 480

(1980).

At the time of his trial, petitioner was an inmate of the Washington State Penitentiary at Walla Walla. On May 12, 1977, 7 months prior to petitioner's trial, the Walla Walla Superior Court issued a general courtroom security order requiring certain security measures be taken with all penitentiary inmates appearing before the court. See Appendix. Petitioner challenges the security order, specifically those portions which require rectal probe searches prior to entry into the courtroom; physical restraints during trial; and limitations on consultation during trial between defendants and counsel. He also claims that several searches of witnesses, jurors and the courtroom violated his right to a fair and impartial trial, because they were made in the jury's presence.

### BACKGROUND OF THE COURTROOM SECURITY ORDER

As the Court of Appeals explained, the penitentiary at Walla Walla is a maximum security prison which ordinarily houses convicted felons considered high risks to institutional security. Many of the prisoners are repeat offenders serving longer sentences for more serious crimes than inmates of other penal institutions in the state. The Walla Walla County Superior Court has jurisdiction over those cases which arise from felonies committed within the penitentiary.

In late March and early April of 1977, inmates Gilcrist and Agtuca were tried by jury in Walla Walla on a charge of first degree assault stemming from an incident in which another inmate was stabbed 31 times. The misconduct at the trial of the defendants and their inmate witnesses is recounted in *State v. Gilcrist,* 91 Wn.2d 603, 590 P.2d 809 (1979), and in the security order at issue in this case. One of the incidents involved a "Bic" lighter left in a defense conference room. A corrections officer conducted a search of the room for contraband and found the lighter on the floor. When he attempted to light the lighter, it exploded, and the officer lost three fingers on his right hand. The prison

administration later informed the trial court that an inmate witness had made a bomb out of the lighter and had it on his person the day he testified. Finding no opportunity to use it, he passed it to a defendant who left it on the conference room floor the next day. The superintendent also testified that the bomb had been brought into the courtroom in a "keister [cache]", a metal device which can be inserted in the rectum and used for carrying both contraband and weapons.

On May 12, 1977, Judge Tuttle of the Walla Walla Superior Court issued a blanket security order as a result of the court's experience in *Gilcrist* and other cases. The stated reasons for the blanket order were the court's belief that there is no reliable way to distinguish violent from nonviolent prisoners and that all inmates are potentially dangerous because of the nature of the prison setting itself. The order provides, in part:

1. Inmates will be searched at the prison before departure. They will be brought to the Walla Walla County Jail where they will be skin and probe searched under the supervision of the sheriff's personnel. As needed, they will be brought to the courtroom in the joint custody of the sheriff's personnel and penitentiary custodial staff.

2. Inmates will remain in arm and leg restraints.

3. Defendants will not sit at the counsel table. Security officers will remain sufficiently close to defendants to control their actions. Confidential matters will be discussed with counsel either in the courthouse hallway or the County Jail, depending on the duration of the conference.

Report of Proceedings, at 52–53; see Appendix.

Some months after the blanket security order was issued, petitioner, a Walla Walla inmate, was charged with possession of a controlled substance. Petitioner had been convicted in 1972 of two counts of armed robbery and burglary in the second degree. In 1969 he had been convicted of escape from a reformatory honor camp. His penitentiary record shows that he has incurred one or more infractions of prison rules every year of his incarceration, dealing pri-

marily with drugs or drug paraphernalia. Shortly after his incarceration, a routine cell check disclosed 11 rounds of .22 caliber ammunition and a knife. In 1976 he was found in possession of a diagram of a handgun. Many of these infractions, including the one in which the ammunition and knife were found, were "cell tags": in multi–occupant cells, possession of contraband and weapons found in a cell are attributed to all occupants. Petitioner's record of convictions and prison infractions was set out by the Court of Appeals in an appendix. *Hartzog,* at 598.

On October 27, 1977, petitioner was arraigned in Superior Court on the controlled substance charge. In an affidavit dated January 18, 1978, petitioner stated that prior to leaving the penitentiary for his court appearance, he had been required to surrender his clothing and put on a jumpsuit. He was then shackled and transported approximately 3 miles to a small room that he believed was in the county courthouse. A sheriff ordered him to take off his jumpsuit. He was told to bend over a radiator, and a prison hospital staff member used his finger to probe defendant's rectum. Petitioner was then allowed to dress and was escorted to court.

After he returned from his arraignment, Hartzog stated that the member of the hospital staff who conducted the probe search ridiculed him in front of four or five other inmates about the probe search.[1] Petitioner alleged that he was embarrassed and humiliated by this statement. Petitioner also affirmed that he would not appear personally in court to testify on his own behalf at trial if he were ordered to submit again to a rectal probe search before being allowed to appear in court.[2]

---

[1]This statement was unrefuted by the State. Both the trial court and the Court of Appeals have made it plain that they found such conduct offensive and inexcusable. We concur in the Court of Appeals view that such conduct should be subject to prison discipline. *State v. Hartzog,* 26 Wn. App. 576, 581 n.4, 615 P.2d 480 (1980).

[2]Petitioner also appeared on a motion to suppress heard December 27, 1977,

On January 19, 1978, the court denied petitioner's motion to set aside the courtroom security order. Petitioner then sought and obtained in federal district court a temporary restraining order which enjoined the Walla Walla County Superior Court from conducting body cavity inspections pursuant to the blanket security order on petitioner, or on any inmate witness that might be called in his criminal trial, except for those searches conducted upon an individualized showing of probable cause.

On January 25, 1978, the Walla Walla Superior Court held a probable cause hearing. The court considered petitioner's criminal and institutional records, which are summarized above, and those of his two witnesses, Manuel Rosalez and Lanny Sergeant. The prosecutor also submitted, for illustrative purposes only, a 4–inch by 11/16–inch machined aluminum "keister cache" which can be inserted in the rectum and used both for carrying contraband or as a weapon.[3] Exhibit 4. There was no allegation that such a device had ever been used by petitioner or his witnesses.

At first reserving its ruling on the body cavity search, the court ordered that all other measures contemplated by the security order, including strip searches, magnetometer searches, and the use of shackles be employed at petitioner's trial. The court later found probable cause for the probe searches of petitioner and his two witnesses.

Petitioner and his witnesses chose not to submit to shackling and probe searches and were therefore absent

---

and was subjected to another rectal probe search, according to his attorney. To avoid confusion it should be noted that the opinion of the Court of Appeals refers only to the October 27 search.

[3]The Court of Appeals described this device as follows:

"The keister cache introduced as an exhibit here is a machine–tooled stainless steel cylinder approximately 4 inches long and 11/16 of an inch in diameter. One end of the cylinder can be unscrewed revealing a blade screwed into the remaining portion of the cylinder. This can then be removed from the inside of the cylinder and screwed into the other end. With the cap rescrewed, the result is a knife with a 3–inch blade and a 4–inch handle." State v. Hartzog, 26 Wn. App. 576, 582 n.5, 615 P.2d 480 (1980).

during trial, although their testimony was viewed by the jury on videotape. Before trial began, the court, over defense objection, ordered a search of everyone who went into the courtroom, including jurors. During the trial, defense attorneys and courtroom visitors were searched in the jury's presence. The record is not clear, but some of these searches appear to have been magnetometer searches, while others were patdowns. On the morning of the second day of trial, two sheriff's officers searched the courtroom in the presence of some jurors, despite the fact that the defendant and his witnesses were not expected to attend the trial. The court denied a defense motion for a mistrial, and the jury eventually returned a verdict of guilty.

The Court of Appeals reversed the trial court in several respects. *State v. Hartzog*, 26 Wn. App. 576, 615 P.2d 480 (1980). The court held that a probe search conducted *within the prison* is reasonable if, on balance, the State's interest in order and security outweighs the prisoner's rights to privacy and to freedom from unreasonable searches and seizures. *Bell v. Wolfish*, 441 U.S. 520, 60 L. Ed. 2d 447, 99 S. Ct. 1861 (1979). Although it is unclear whether the court meant that prison probe searches must rest on an individualized showing, it held that probe searches conducted pursuant to courtroom security orders can be enforced only on a case–by–case basis. *Hartzog*, at 584. The court read the security order to require two searches, one at the prison and another at the jail, and concluded that it could not assume that the prison search would not include a probe search. Since the record did not set forth the independent necessity for a second search at the courthouse, the court held that, should a breach of security occur between the departure from the penitentiary and the arrival at the courthouse, a hearing should be held to determine the likelihood that the prisoner was in possession of a weapon, drugs, or contraband. *Hartzog*, at 584. The court concluded that the security order was too broad as to probe searches, that petitioner had properly declined to submit to a second search, and that his refusal to attend

the trial was therefore justified. Accordingly, petitioner had been denied his right to attend his trial and defend in person. Const. art. 1, § 22 (amendment 10); *Hartzog,* at 584–85.

Similarly, as to arm and leg restraints, the court held that shackles may not be ordered pursuant to a general security order. The court declined to comment on the physical separation of a defendant from his counsel, except to suggest that the trial court might wish to reexamine this provision on remand, particularly as it relates to denial of effective assistance of counsel. *Hartzog,* at 589. Finally, the court held that neither intent nor guilty knowledge is an element of the crime of possession of a controlled substance. The Court of Appeals reversed and remanded the case for a new trial.

### Body Cavity Searches

The first question we must decide is under what circumstances the trial court may order that inmates of the state penitentiary at Walla Walla must submit to probe searches before they are allowed to appear in court as defendants or witnesses.

█ The parties agree that convicted incarcerated persons are "not wholly stripped of constitutional protections when [they are] imprisoned for crime. There is no iron curtain drawn between the Constitution and the prisons of this country." *Wolff v. McDonnell,* 418 U.S. 539, 555–56, 41 L. Ed. 2d 935, 94 S. Ct. 2963 (1974). On the other hand, many rights and privileges are subject to limitation in penal institutions because of paramount institutional goals and policies. *Bell,* at 545–46; *Wolff,* at 555–56; *Rhodes v. Chapman,* 452 U.S. 337, 69 L. Ed. 2d 59, 101 S. Ct. 2392 (1981).

Courts have addressed the constitutionality of body cavity visual and probe searches in several different contexts. Where persons subjected to such searches are unconvicted and unincarcerated, as in the border search cases, the United States Court of Appeals for the Ninth Circuit has required a stringent showing of "a real suspicion, directed

specifically to that person" and supported by objective, articulable facts before authorities may conduct the search. *Henderson v. United States,* 390 F.2d 805, 808 (9th Cir. 1967); *United States v. Guadalupe–Garza,* 421 F.2d 876, 879 (9th Cir. 1970). *United States v. Sosa,* 469 F.2d 271 (9th Cir. 1972).

Similarly, courts have invalidated both visual and probe searches of criminal suspects. *United States ex rel. Guy v. McCauley,* 385 F. Supp. 193, 198–99 (E.D. Wis. 1974) (visual vaginal search of woman seven months pregnant was performed two times by policewomen in "nonmedical" surroundings); *People v. Bracamonte,* 15 Cal. 3d 394, 540 P.2d 624, 124 Cal. Rptr. 528 (1975) (forcible ingestion of emetic to cause vomiting of plastic bags containing heroin violated U.S. Const. amend. 4 where less intrusive means were available and the conduct of the police officers was brutal and offensive). Moreover, the "real suspicion" test of the border search cases has been applied to a visual anal search of a *visitor* to a penitentiary inmate. *Black v. Amico,* 387 F. Supp. 88, 91 (W.D.N.Y. 1974).

As to incarcerated persons, some recent cases provide authority for blanket body cavity searches in the institutional setting. For example, in *Bell,* pretrial detainees and sentenced prisoners brought suit against a federal short–term custodial facility challenging several security measures, including body cavity visual searches, employed at the institution. In upholding the district court intervention in these matters, the Court of Appeals held that under the due process clause of U.S. Const. amend. 5, "pretrial detainees may be subjected to only those 'restrictions and privations' which 'inhere in their confinement itself or which are justified by compelling necessities of jail administration.'" *Wolfish v. Levi,* 573 F.2d 118, 124 (2d Cir. 1978). Addressing body cavity visual searches specifically, the court noted that courts which have permitted such intrusions have been presented with a demonstrated security justification. On the record before it, which established only one instance of contraband being found during a body

cavity search over several years, the court concluded:

> The gross violation of personal privacy inherent in such a search cannot be outweighed by the government's security interest in maintaining a practice of so little actual utility. To speak plainly, *in the circumstances presented by this record,* the procedure shocks one's conscience. *See Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952).

(Some italics ours.) *Wolfish v. Levi, supra* at 131.

The United States Supreme Court reversed, holding that the Constitution does not provide a source for the "compelling necessity" standard, and that the due process clause does not prohibit every disability imposed during pretrial detention, but only those that amount to "punishment" in the constitutional sense. *See Kennedy v. Mendoza–Martinez,* 372 U.S. 144, 168–69, 9 L. Ed. 2d 644, 83 S. Ct. 554 (1963). Thus, so long as pretrial detainees did not suffer "punishment" during their incarceration, the institution's security practices did not violate the due process clause. As to the claim that body cavity searches violate U.S. Const. amend. 4, the court said that the practice of requiring detainees to expose their body cavities for visual inspection as part of a strip–search conducted after every contact visit with a person from outside the institution gave it "the most pause." *Bell,* at 558. However, it nonetheless concluded that these searches did not violate the Fourth Amendment. Employing a standard of reasonableness, the court explained:

> In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

*Bell v. Wolfish,* 441 U.S. 520, 559, 60 L. Ed. 2d 447, 99 S. Ct. 1861 (1979).[4]

---

[4]While the court referred to "each case", a close reading of the entire opinion reveals that it actually appeared to uphold a blanket rule applied to all detainees.

In *Daughtery v. Harris,* 476 F.2d 292 (10th Cir.), *cert. denied,* 414 U.S. 872, 38 L. Ed. 2d 91, 94 S. Ct. 112 (1973), the court held that prison officials of a maximum security institution containing many dangerous inmates could require rectal searches of all inmates prior to release to the United States Marshal's office for appearance in court. The decision was based on the fact that there were many known incidents of concealed contraband being carried by inmates in the rectal cavity, and that several serious episodes, including the wounding of a court officer, were attributable to the ability of inmates to smuggle weapons out of prison. *Daughtery* was cited with apparent approval in *Bell,* at 560 n.41.[5]

On the basis of the cited cases, it is plain that the administrators of the penitentiary at Walla Walla could have ordered prison strip and probe searches of all inmates prior to court appearances. *Bell v. Wolfish, supra; Daughtery v. Harris, supra.* The difficult question is whether the trial court's blanket security order required two probe searches—one at the penitentiary and one at the courthouse.

 Aside from the thorny issue of whether a trial court may order officials to perform probe searches within the walls of the institution, a question we are not asked to, and do not, decide, we do not read the blanket order as requiring two body cavity searches. The order states:

1. Inmates will be *searched* at the prison before departure. They will be brought to the Walla Walla County

See Note, *Constitutional Law—Bell v. Wolfish: A Balk at Constitutional Protection for Pretrial Detainees,* 48 U. Mo. K.C. L. Rev. 466 (1980).

[5]Other courts have disapproved body cavity searches of inmates absent a showing by the institution of a legitimate security need. *See for example Frazier v. Ward,* 426 F. Supp. 1354, 1363–66 (N.D.N.Y. 1977) (blanket rectal probe searches of high–risk prison inmates invalidated when prison security interests not seriously jeopardized and searches were carried out in humiliating manner); *Hodges v. Klein,* 412 F. Supp. 896, 899 (D.N.J. 1976) (anal inspection disallowed on prisoners returning to solitary confinement from heavily–guarded exercise yard, in absence of showing of some breach of security).

Jail where they will be *skin and probe searched* under the supervision of the sheriff's personnel.

(Italics ours.) Report of Proceedings, at 52–53; see Appendix. The only probe search required by the plain language of the order is the one to be performed at the jail before a court appearance. Moreover, petitioner's uncontested affidavit reveals that only one probe search was performed on petitioner on the day of his arraignment.

The Court of Appeals apparently assumed that a probe search had been conducted at the prison because such searches are common in that setting. *State v. Hartzog,* 26 Wn. App. 576, 584 n.9, 615 P.2d 480 (1980); see Appendix. There is, however, nothing in the record to support that assumption. As the security order indicates, the trial court in an earlier case involving penitentiary inmates also assumed authorities had conducted a probe search at the penitentiary. Nonetheless, a Bic lighter containing an explosive was brought into the courthouse, and it caused severe injury to a correctional officer.

Referring to this incident, the superintendent of the penitentiary, in his May 12, 1977, testimony in support of the proposed security order, told the court that inmates involved in previous trials had manufactured small bombs which they carried into the courthouse in "keister [caches]". It was the superintendent's view that the devices were used as a diversion: when they exploded, causing confusion, inmates could attempt to escape. "There was a tradition for that mode of escape from this courtroom", the superintendent testified. Report of Proceedings, at 30. It seems apparent that the trial court in Walla Walla had reasonable grounds, based on past experience, to fear similar breaches of courtroom security in proceedings involving penitentiary inmates.

In addition, we may take notice of the fact that the state penitentiary has been the locus of serious ferment in recent years. Hunger strikes, violence, and lock–downs have been reported frequently in the news media. Prison inmates recently brought a civil rights proceeding in federal court,

challenging the conditions of their confinement as cruel and unusual punishment. Hoptowit v. Ray, No. 79-359 (E.D. Wash. 1980) (unpublished). In upholding plaintiffs' claims, the district court judge filed a memorandum opinion which is attached to the State's motion for reconsideration to the Court of Appeals. The federal court, basing its ruling on the live testimony and sworn affidavits of over 100 witnesses, made detailed findings that, *inter alia,* the penitentiary was "dangerously" overcrowded, Hoptowit, at 7; that there was a "high level of physical violence" at the penitentiary, Hoptowit, at 10; that the prison administration had imposed in 1979 a lock-down which lasted over 4 months, and which was made necessary "because of the extremely high level of tension and violence at the institution and the need to reestablish administrative control", Hoptowit, at 12. Regardless of the disposition of plaintiffs' legal claims on appeal, the federal court's detailed findings support the State's contention, made forcefully in this case, that conditions inside the penitentiary have had a substantial impact on the community of Walla Walla and on the Superior Court's ability to maintain courtroom order and decorum.

It is fundamental that a trial court is vested with the discretion to provide for courtroom security, in order to ensure the safety of court officers, parties, and the public. This responsibility has been recognized by the United States Supreme Court:

> It is essential to the proper administration of criminal justice that dignity, order, and decorum be the hallmarks of all court proceedings in our country.

*Illinois v. Allen,* 397 U.S. 337, 343, 25 L. Ed. 2d 353, 90 S. Ct. 1057 (1970); *Burgess v. Towne,* 13 Wn. App. 954, 960, 538 P.2d 559 (1975); *State v. Basford,* 1 Wn. App. 1044, 1050-51, 467 P.2d 352 (1970). Thus, in circumstances where, as here, the record fails to disclose that an inmate-defendant has undergone a body cavity probe search immediately before leaving the penitentiary, the Walla Walla Superior Court may justifiably impose such a search

pursuant to its security order.[6]

PHYSICAL RESTRAINT OF DEFENDANT DURING TRIAL

Petitioner argues that the security order is too broad as it applies to physical restraints and that the decision to employ shackles must be made only after an individualized showing of necessity.[7] Moreover, petitioner argues, appellate review of a ruling on physical restraint should not be based on a mere abuse of discretion standard. Rather, since the right to be free of shackles is a fundamental one arising out of Const. art. 1, § 22 (amendment 10), the appellate court should independently review the record to determine if the trial court has made the proper balancing of interests. Many years ago, this court said:

---

[6]We are mindful that on January 26, 1978, petitioner obtained a temporary restraining order from the United States District Court, enjoining the state trial court from requiring a body cavity probe search except on an individualized showing of probable cause. Petitioner and other plaintiffs moved for a permanent injunction and class certification. The United States District Court, in its memorandum and order No. C–78–12, stayed further proceedings pending our decision in this case, citing "principles of comity and federalism". *Younger v. Harris*, 401 U.S. 37, 44, 27 L. Ed. 2d 669, 91 S. Ct. 746 (1971); *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 43 L. Ed. 2d 482, 95 S. Ct. 1200 (1975).

Aside from the considerable difficulties of finding probable cause that an inmate may be carrying a "keister cache", the federal court order does not state whether the court read the security order to require one search, as we interpret it, or two, as petitioner contends. We merely hold that in the circumstances of this case, where there is no showing that a body cavity probe search has been done, the Walla Walla trial court may require *inmate–defendants to submit to the procedure*.

It goes without saying that such searches should be conducted in as clinical and neutral a manner as possible. Footnote 1, *supra*. Many courts have frowned upon the "humiliating" and "degrading" circumstances imposed by some personnel conducting body cavity searches. *Bell v. Wolfish*, 441 U.S. 520, 560, 60 L. Ed. 2d 447, 99 S. Ct. 1861 (1979); *Frazier v. Ward*, 426 F. Supp. 1354, 1363 (N.D.N.Y. 1977); *People v. Bracamonte*, 15 Cal. 3d 394, 540 P.2d 624, 124 Cal. Rptr. 528 (1975).

[7]We realize that this and the following issue are not technically before us. Since petitioner refused to appear for trial if he were required to undergo a probe search, the provisions of the security order regarding shackling and separation from counsel in the courtroom were not implemented against petitioner. Nonetheless, since the security order may be of concern in future cases involving penitentiary inmates, we address these issues for the trial court's guidance.

Section 22, art. 1, of our constitution, declares that, "In criminal prosecutions the accused shall have the right to appear and defend in person." The right here declared is to appear with the use of not only his mental but his physical faculties unfettered, and unless some *impelling necessity* demands the restraint of a prisoner to secure the safety of others and his own custody, the binding of the prisoner in irons is a plain violation of the constitutional guaranty.

(Italics ours.) *State v. Williams,* 18 Wash. 47, 51, 50 P. 580 (1897). Citing the great common law authorities, the court added,

The common law of England was expressly adopted by legislative enactment at the first session of the legislative assembly of this territory, and there is no doubt that the ancient right of one accused of crime under an indictment or information to appear in court unfettered, is still preserved in all its original vigor in this state.

*Williams,* at 50. The *Williams* holding has recently been strongly reaffirmed in *State v. Maryott,* 6 Wn. App. 96, 99–100, 492 P.2d 239 (1971).

Restraints have been viewed historically as an extreme measure to be used only when necessary to prevent injury to those in the courtroom, to prevent disorderly conduct at trial, or to prevent an escape. *Illinois v. Allen, supra* at 344; *Kennedy v. Cardwell,* 487 F.2d 101, 105 (6th Cir. 1973), *cert. denied,* 416 U.S. 959, 40 L. Ed. 2d 310, 94 S. Ct. 1976 (1974).

Restraints are viewed with disfavor because they may abridge important constitutional rights, including the presumption of innocence, privilege of testifying in one's own behalf, and right to consult with counsel during trial. *Kennedy,* at 105–06. As a result of these problems, many courts have held that trial courts may not practice a general policy of shackling defendants. *See, e.g., United States v. Theriault,* 531 F.2d 281 (5th Cir. 1976); *United States v. Samuel,* 431 F.2d 610 (4th Cir. 1970); *People v. Duran,* 16 Cal. 3d 282, 545 P.2d 1322, 127 Cal. Rptr. 618, 90 A.L.R.3d 1 (1976). No persuasive reason has been advanced why this

rule should not apply as well to inmate defendants. Indeed, many of the cases invalidating shackles in a particular case have involved inmates. *See, e.g., Kennedy v. Cardwell, supra; State v. Williams, supra; State v. Coursolle,* 255 Minn. 384, 97 N.W.2d 472, 75 A.L.R.2d 755 (1959).

As to shackling of witnesses, slightly different interests are implicated. While a shackled witness may not directly affect the presumption of innocence, it seems plain that there may be some inherent prejudice to defendant, as the jury may doubt the witness' credibility. *See Kennedy,* at 105 n.5. Thus, the physical restraint of witnesses should likewise be undertaken only in compelling circumstances, which the trial judge should explain on the record. *United States v. Roustio,* 455 F.2d 366, 371 (7th Cir. 1972); *see* 3 American Bar Ass'n, *Standards for Criminal Justice,* Std. 15–3.1(c) (2d ed. 1980).

The State contended that exigent circumstances in the penitentiary in general and in the Walla Walla community justified the blanket order shackling procedure. None of the circumstances alleged, however, are shown directly attributable to petitioner, and the State cites no case where a court has ordered shackling of an inmate defendant because of general conditions at his place of incarceration. Rather, in the cases that have permitted shackling, the specific facts relating to the individual have been found to justify the practice. *United States v. Kress,* 451 F.2d 576 (9th Cir. 1971) (defendant had previously escaped from custody for 2 months); *United States v. Samuel,* 433 F.2d 663 (4th Cir. 1970) (trial court had reason to believe defendant and a codefendant might attempt bodily harm to a government witness at trial); *Loux v. United States,* 389 F.2d 911, 919 (9th Cir.), *cert. denied,* 393 U.S. 867, 21 L. Ed. 2d 135, 89 S. Ct. 151 (1968) (all three defendants had escaped multiple times from prison).

Here, in addition to the policy incorporated in the security order, the trial judge relied upon the assumption that the jury was bound to learn petitioner and his witnesses were prison inmates. Thus, the court reasoned, if *all*

inmates were brought into and remained in court in physical restraints, the jury would not be affected or prejudiced thereby. We cannot agree.

A trial judge must exercise discretion in determining the extent to which courtroom security measures are necessary to maintain order and prevent injury. That discretion must be founded upon a factual basis set forth in the record. A broad general policy of imposing physical restraints upon prison inmates charged with new offenses because they may be "potentially dangerous" is a failure to exercise discretion. *People v. Duran, supra* (overruling three California appellate cases based on such a general policy). *See also Woodards v. Cardwell,* 430 F.2d 978 (6th Cir. 1970), *cert. denied,* 401 U.S. 911, 27 L. Ed. 2d 809, 91 S. Ct. 874 (1971); *State v. Roberts,* 86 N.J. Super. 159, 206 A.2d 200 (1965); *Moore v. State,* 535 S.W.2d 357 (Tex. Crim. App. 1976). The activities of other persons, either unrelated or not imputable to an accused, may not be used as a basis for shackling a criminal defendant. *Willocks v. State,* 546 S.W.2d 819, 821 (Tenn. Crim. App. 1976).

The Court of Appeals, which considered this issue carefully, set forth standards for the trial court to consider when it is faced with a physical restraint issue:

> *State v. Tolley,* 290 N.C. 349, 368, 226 S.E.2d 353 (1976), sets forth several factors which the trial court may consider, *inter alia,* in determining whether to use physical restraints on an inmate defendant or inmate witnesses:
>
>> [T]he seriousness of the present charge against the defendant; defendant's temperament and character; his age and physical attributes; his past record; past escapes or attempted escapes, and evidence of a present plan to escape; threats to harm others or cause a disturbance; self–destructive tendencies; the risk of mob violence or of attempted revenge by others; the possibility of rescue by other offenders still at large; the size and mood of the audience; the nature and physical security of the courtroom; and the adequacy and availability of alternative remedies.

We recognize in appropriate circumstances additional security measures must be taken to provide for the safety of the public and those in attendance upon the courts of this state. Such security measures, including physical restraints, are within the inherent power and discretion of the trial judge. The necessity for those measures must be made on a case–by–case basis after a hearing with a record evidencing the reasons for the action taken. . . . In weighing the protection of persons in the courtroom and the rights of a defendant, the trial judge must choose from "a wide variety of possible choices all within the permissible areas of judicial discretion." *State v. Basford,* 1 Wn. App. 1044, 1050, 467 P.2d 352 (1970). For example, the relocation of the witness stand and the reasonable use of additional security personnel are proper precautions. Further, if restraints are found necessary, those persons shackled may be in place at the time the jury is brought into the courtroom and remain so until the jury leaves, so the physical restraints will make less impact. The court may also consider the use of metal detectors and other security devices. The court may take such measures on an individualized basis without the necessity of a general security order.

*State v. Hartzog,* 26 Wn. App. 576, 588–89, 615 P.2d 480 (1980). We adopt these standards as a practical solution to this problem, and further agree with the Court of Appeals that the standard for appellate review will be whether the trial court has abused its broad discretion to provide for order and security in the courtroom. *See People v. Duran, supra,* at 293.

### SEPARATION FROM LEGAL COUNSEL

Petitioner next contends that the security order provision concerning separation of defendants from counsel and limitation of consultation during the trial deprives inmate defendants of effective assistance of counsel.[8]

The security order required that (1) defendants not sit at

---

[8]The Court of Appeals did not decide this issue, but urged the trial court to reexamine its blanket order "in light of previous comments" in its opinion and of "the provision's effect as it relates to a denial of effective counsel." *State v. Hartzog,* 26 Wn. App. 576, 589, 615 P.2d 480 (1980).

counsel table; (2) confidential matters be discussed only in the courthouse hallway or in the county jail, depending on the duration of the conference; (3) security officers be positioned sufficiently close to defendants as to "control their actions"; and (4) the witness stand be moved to 20 feet from the jury instead of 4½ feet. Report of Proceedings, at 52–53; see Appendix.

■ The constitutional right to have the assistance of counsel, Const. art. 1, § 22 (amendment 10), carries with it a reasonable time for consultation and preparation. Consultation includes not only assistance in trial preparation, but opportunity for private and continual discussions between defendant and his attorney during the trial. *See State v. Hartwig,* 36 Wn.2d 598, 601, 219 P.2d 564 (1950); *State v. Cory,* 62 Wn.2d 371, 376, 382 P.2d 1019, 5 A.L.R.3d 1352 (1963). Where the court has reason to believe that courtroom security will be impaired if it permits the defendant to have the customary access to counsel, it should explore alternatives which impinge as minimally as possible on this important right. *Geders v. United States,* 425 U.S. 80, 89–90, 47 L. Ed. 2d 592, 96 S. Ct. 1330 (1976).

> In every criminal trial the accused has a common law right to counsel, and this right may not be abridged by any rule or regulation which would operate to hinder and obstruct free consultation between the accused and his appointed counsel . . . [T]he accused has a right to sit with his counsel where he can have equal opportunity to hear the testimony of the witnesses, and absolute freedom to assist by suggestion and information in his own defense. . . . It was defendant's right to sit with his counsel if he desired, and the trial judge should have recognized his right so to do. *If there were considerations peculiar to the defendant sufficient to move the court to deny him the privilege, these should have been stated and put upon the record* so that their reasonableness might be judged;

(Italics ours.) *Commonwealth v. Boyd,* 246 Pa. 529, 533–34, 92 A. 705 (1914).

Applying these principles to the present case, it seems clear that the counsel table and consultation restrictions, had they been imposed, would have reduced Hartzog's ability to confer with counsel, impinging on his rights under U.S. Const. amend. 6 and Const. art. 1, § 22 (amendment 10). As in the case of shackles, we think the trial court must show (1) that there are compelling reasons why these rights must be curtailed and (2) that no less stringent measures can accomplish the same goals. *Cf. Geders v. United States, supra.* The fact that penitentiary inmates in a previous trial had engaged in admittedly serious misconduct is not a consideration sufficiently "peculiar to the defendant" in the present case to justify blanket application of this portion of the security order.

The placement of the witness stand a further distance from the jury does not directly present an effective assistance of counsel issue, although it may affect the presumption of innocence. The jury may draw prejudicial conclusions from the fact that a particular defendant or witness is kept at a greater distance than most other witnesses. *See generally Kennedy v. Cardwell,* 487 F.2d 101 (6th Cir. 1973). Moreover, an instruction to disregard the placement of the witness stand could draw more attention to its unusual location. While the parties have cited no cases involving a similar security precaution, we think it a practical solution that, at the time the trial court undertakes an individualized consideration of the necessity for physical restraints and limitation of consultation with legal counsel, it could at the same hearing decide whether the witness stand should be relocated.

### SEARCHES OF JURORS, WITNESSES, AND COURTROOM

Petitioner also complains that additional security measures taken at his trial denied him his right to a fair and impartial trial. Const. art. 1, §§ 21 and 22 (amendment 10). These measures included magnetometer searches of jurors and witnesses and searches of the courtroom in the jury's presence. The Court of Appeals did not address this issue.

Counsel objected at trial to the searches of jurors on the grounds that jurors would conclude before trial that Hartzog was an "unusually dangerous person". Report of Proceedings, at 105–06. The court made no response to the objection, nor did it explain its reasons for requiring the searches, except to state that pursuant to the security order it would instruct the jury to draw "no inferences" from any of the security precautions. Report of Proceedings, at 106.

Counsel further objected to the magnetometer searches of witnesses. Counsel stated that although these searches were conducted outside the courtroom, the door was ajar and the "buzz" of the magnetometer was clearly audible. The court, in denying petitioner's motion for a mistrial, stated that the door was "almost closed", nothing was visible outside the door, and "[t]he Court did not hear any metal detector buzz." Report of Proceedings, at 210.

Finally, counsel objected to a search of the courtroom, made just prior to convening of the second day of trial, in the presence of several jurors.

The basis of petitioner's objection to all the above procedures is that the impartiality of the courtroom atmosphere during the trial was destroyed or impaired. He does not argue that these searches are necessarily unconstitutional, but only that if they are found necessary, they should be conducted outside the jury's presence.

This court has encouraged the courts to maintain an impartial atmosphere during trials:

> While so–called laboratory conditions can never be realized, it is, nevertheless, the burden of the courts to strive for them and to try all cases in an atmosphere of complete impartiality, not only without any reservation whatever but devoid of appearance of any such reservation.

*State v. Swenson,* 62 Wn.2d 259, 281, 382 P.2d 614 (1963). The constitutional underpinning, as in the case of physical restraints, is the presumption of innocence. Const. art. 1, § 3.

We think the potential prejudicial effect of such searches

is obvious, and in some circumstances would constitute reversible error. However, a reading of the testimony in this case, summarized briefly below, persuades us that the searches under review were harmless error. *State v. Stephens*, 93 Wn.2d 186, 190–91, 607 P.2d 304 (1980). We emphasize that it takes very little additional effort for the court, in discharging its responsibility to manage the trial, to require these measures to be taken when jurors are not present.

Obviously, the jury will be unavoidably aware of any searches of their own persons, and thus any prejudicial effect cannot be as easily alleviated. The trial court apparently believed that residents of Walla Walla would be relieved to observe security measures in penitentiary cases, and inferentially that they would not mind being subjected to personal searches. Report of Proceedings, at 53; see Appendix. But since the impartiality of the trial is affected, and because no less intrusive alternatives are readily apparent, we think it the better practice for the trial court to state on the record the reasons why a search of jurors furthers the goal of courtroom security in a particular case. *See State v. Gilcrist*, 91 Wn.2d 603, 613–14, 590 P.2d 809 (1979).

### Possession of a Controlled Substance

Petitioner's substantive challenge to his conviction raises the question whether intent or guilty knowledge is an element of the crime of possession of a controlled substance.

The sequence of events out of which the charge of possession of a controlled substance arose is basically as follows: On October 3, 1977, two correctional officers found Hartzog and two other prison inmates in a room off the Confederated Indian Tribes clubroom at the penitentiary. On a television set in the room the officers saw two spoons containing a milky substance, a couple of white paper packets, and a tape sheath device. As Officer Hartford was searching petitioner, a syringe fell out of the front of petitioner's pants. Expert testimony subsequently established

the residue on the spoons and syringe was an amphetamine. At trial, petitioner admitted possession of the substance, but testified he thought the white substance was Valium, which at the time of its discovery was not a controlled substance.

Petitioner assigns error to the trial court's refusal to give instruction No. 2, which included intent and guilty knowledge as elements of the crime of possession of a controlled substance.

Petitioner also assigns error to the giving of instruction No. 3, because it did not include these elements. He argued the instruction should include the defense of unwitting possession, although no such instruction was proposed. In upholding petitioner's conviction, the Court of Appeals held that neither intent nor guilty knowledge was an element of the crime. *State v. Hartzog,* 26 Wn. App. 576, 590–95, 615 P.2d 480 (1980).

We have recently decided this very issue in the case of *State v. Cleppe,* 96 Wn.2d 373, 635 P.2d 435 (1981). That decision holds that neither intent nor guilty knowledge are elements of the crime of possession of a controlled substance. Since *Cleppe* is dispositive, we affirm the Court of Appeals on this issue.

We also affirm the Court of Appeals on the physical restraint issue, but reverse on the question of the body cavity search. The conviction is accordingly affirmed.

### Appendix

#### Order re Courtroom Security

The experiences of this Court together with information supplied to and recommendations made to it lead to the conclusion that major changes must be made forthwith in courtroom and courthouse security measures in cases emanating from the Washington State Penitentiary.

Psychiatric evaluation reports received by the Court, the testimony of inmates at hearings and trials, and the conduct of inmates both in and out of the courtroom evidence that many individuals are being brought into the courtroom who constitute an extreme danger to the public, jurors, court personnel, custodial staff and security staff. Heedless of the consequences of their actions, they are willing to murder or maim inno-

cent people merely for their morbid amusement, trial delays, mistrials or escape diversions.

In the last penitentiary trial March 29th through April 5th, State v. Agtuca and Gilcrist, at the morning recess of the second day Gilcrist "accidentally" spilled coffee on his clothing and refused to come to the courtroom without his being taken back to the penitentiary for a change of clothing. The guards were ordered to produce him in court immediately. At the noon recess, the Court was informed at 1:25 p.m. that both defendants had "accidentally" spilled milk on their clothing during lunch and refused to come to court without a change of clothing. They were ordered produced in court without delay. At one point in the trial, Gilcrist "accidentally" ripped his pants and there was a delay until another pair was brought down from the penitentiary. At another point in the trial out of the presence of the jury Gilcrist following an adverse ruling by the Court gave the Court "the finger" (the Rockefeller salute). At the next recess of the Court following this incident the defendant Gilcrist wrote the Court a note of apology for his conduct, which is made a part of this record, and included a request for aspirin and Digel. The requested medication was provided by the Court.

The first witness for the defense stepped down from the witness stand and asked the prosecutor for a cup of water. Provided with a small amount, he proceeded to throw it in the face of the number ten juror because he didn't like the way the juror had been looking at him.

Before the defendants testified, the Court gave specific instructions to the correction officer in charge of security that the defendants were not to take the stand with pencils, pens or any articles on their persons. The defendant Agtuca took the stand and when asked to stand to exhibit a scar to the jury, the Court observed a comb and what appeared to be a blue pen (later confirmed) protruding from his right rear pocket.

Although all witnesses and defendants were presumably skin and probe searched before leaving the penitentiary, the Court has been informed by the prison administration that one of the witnesses made a bomb with a Bic lighter and had it on his person the day he testified. Finding no opportunity to use it, he passed it to one of the defendants who brought it to the courthouse the next day (last day) of the trial and left it on the floor of the conference room where prisoners are held during recesses to confer with their lawyers. While conducting a search of the room for contraband, a penitentiary correctional officer found the lighter on the floor, attempted to light it and suffered the loss of three fingers of his right hand in the resulting explosion.

A number of witnesses in the Agtuca–Gilcrist trial as well as other penitentiary trials heard by this Court have testified they engage daily in the practice of the martial arts to keep physically fit and to improve their skills in the use of deadly force with or without weapons.

While some of these inmates are predictable risks obviously requiring

special precautions, the predictability comes from past experience. The prison setting itself can trigger violent action in an individual who has not exhibited it before. Therefore, this Court deems there is no way to reliably distinguish the violent from the nonviolent. All inmates are potentially dangerous.

The witness stand is 52 inches from the number seven juror's chair. Witnesses pass within 18 inches of all front-row jurors in taking and departing the witness stand.

In my considered opinion, there is no way to adequately secure our existing courtroom facilities without taking the following measures for trials requiring the presence of penitentiary inmates:

1. Inmates will be searched at the prison before departure. They will be brought to the Walla Walla County Jail where they will be skin and probe searched under the supervision of the sheriff's personnel. As needed, they will be brought to the courtroom in the joint custody of the sheriff's personnel and penitentiary custodial staff.

2. Inmates will remain in arm and leg restraints.

3. Defendants will not sit at the counsel table. Security officers will remain sufficiently close to defendants to control their actions. Confidential matters will be discussed with counsel either in the courthouse hallway or the County Jail, depending on the duration of the conference.

4. The witness stand will be located near the left end of the counsel table and between that table and the rail enclosing the clerk and court reporter. It will face the jury box and will be approximately twenty feet from it. Security personnel will be located so as to maintain control of the witness from the time he enters the courtroom until he departs.

5. No witness will be allowed to leave the witness stand without the Court's permission.

6. The Court before impanelling the jury, unless defense counsel requests the Court not to, will advise all jurors that the security measures taken in penitentiary trials are the joint product of the penitentiary administration, the sheriff and the Court; that they are utilized routinely and that no inference is to be drawn from the security measures taken that any particular inmate is a security risk since the same procedures apply to all inmates regardless of their conduct records in the institution. The Court believes that jurors who live in a community where a penal institution is located will be more likely to determine issues fairly and impartially if they can observe for themselves the courtroom is secure. The jurors will be made aware during the course of the trial that the witnesses are inmates. It will be no surprise to jurors in this community that these routine security measures are taken. Thus, there should be no prejudice to defendants.

Judge Mitchell is attending the National Trial Judges' College. This Order therefore applies, at this time, to Department I of this Court only.

The foregoing provisions and requirements of this Order shall be

effective immediately.

Done in open court this 12th day of May, 1977.

/s/ John Tuttle, Judge

Report of Proceedings, at 50–54.

BRACHTENBACH, C.J., and ROSELLINI, STAFFORD, UTTER, DOLLIVER, HICKS, DORE, and DIMMICK, JJ., concur.

Reconsideration denied January 12, 1982.