ORDER
 

 BRYAN, District Judge.
 

 Plaintiff has filed a complaint herein pursuant to 42 U.S.C. § 1983, and the matter has been referred to the United States Magistrate Judge who has made a Report and Recommendation in this matter.
 

 After reviewing the file herein and the Report and Recommendation of the Magistrate Judge, it is hereby
 

 ORDERED:
 

 1. The Report and Recommendation of the Magistrate Judge is hereby approved and adopted by this court.
 

 2. Summary Judgment is granted in favor of the defendants and this action dismissed, each party to bear his own costs.
 

 REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE
 

 FRANKLIN D. BURGESS, United States Magistrate Judge.
 

 This matter has been referred to Magistrate Franklin D. Burgess pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Magistrates’ Rule MR 4. This matter comes before the court upon the Defendants’ Motion for Summary Judgment.
 

 The Plaintiff, currently an inmate at the Washington State Reformatory, seeks relief (declaratory and injunctive relief and damages) under 42 U.S.C. § 1983
 
 [1]
 
 based
 
 *1283
 
 upon an allegedly unconstitutional digital rectal probe search conducted upon the plaintiff on December 19, 1985, at Washington Corrections Center (WCC), Shelton, Washington. The Defendants include the former WCC Associate Superintendent Neal Brown, WCC Lieutenant Watkins, WCC Sergeant Gatchett, and former WCC Physician’s Assistant James Rich.
 

 The Plaintiff contends that the probe search was performed in unsanitary conditions and caused enormous pain. He alleges that the acts of the Defendants violated state law and his constitutional rights under the Fourth, Eighth and Fourteenth Amendments. The Defendants move for summary judgment on the grounds that the search was constitutional both in theory and as it was actually performed.
 

 ANALYSIS
 

 Summary Judgment is proper when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.
 
 [2]
 

 Retail Clerks Union Local 648, AFL-CIO v. Hub Pharmacy, Inc.,
 
 707 F.2d 1030, 1033 (9th Cir.1983). The opposing party “may not rest on conclusory allegations, but must set forth specific facts showing that there is a genuine issue for trial.”
 
 Berg v. Kincheloe,
 
 794 F.2d 457, 459 (9th Cir.1986) (judgment against pro se litigant);
 
 Lake Nacimiento Ranch Co. v. County of San Luis Obispo,
 
 841 F.2d 872, 876 (9th Cir.1987). “One of the primary purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses”
 
 Celotex v. Catrett,
 
 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).
 

 The Supreme Court has recently elaborated on the role of affidavits in summary judgment determinations.
 

 In ruling upon a Rule 56 motion, “a District Court must resolve any factual issues of controversy in favor of the non-moving party” only in the sense that, where the facts specifically averred by that party contradict facts specifically averred by the movant, the motion must be denied. That is a world apart from “assuming” that general averments embrace the “specific facts” needed to sustain the complaint. As set forth above, Rule 56(e) provides that judgment “shall be entered” against the^nonmoving party unless affidavits or other evidence “set forth specific facts showing that there is a genuine issue for trial.” The object of this provision is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit. Cf.
 
 Anderson v. Liberty Lobby, Inc., 477
 
 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (“[T]he plaintiff could not rest on his allegations of a conspiracy to get to a jury without ‘any significant probative evidence tending to support the complaint’ ”), quoting
 
 First National Bank of Arizona v. Cities Service Co.,
 
 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968). Rather, the purpose of Rule 56 is to enable a party who believes there is no genuine dispute as to a specific fact essential to the other side’s case to demand at least one sworn averment of that fact before the lengthy process of litigation continues.
 

 Lujan v. Nat’l Wildlife Federation,
 
 — U.S. -, 110 S.Ct. 3177, 3188-89, 111 L.Ed.2d 695 (1990).
 

 The rectal probe search
 
 [3]
 
 policy challenged here, DOC Policy 420.110 (effective October 1, 1985) provided that “[b]ody cavity searches will be conducted where there is a reasonable suspicion that an offender is concealing contraband in or on the per
 
 *1284
 
 son, prior to placement in an Intensive Management Unit or upon return to the Intensive Management Unit when a good opportunity for concealment has occurred.” Policy 420.110(A)(2)(a).
 

 I. Probe Search Policy
 

 “Lawful imprisonment necessarily makes unavailable many rights and privileges of the ordinary citizen, a ‘retraction justified by the considerations underlying our penal system.’ ”
 
 Wolff v. McDonnell,
 
 418 U.S. 539, 555, 94 S.Ct, 2963, 2974, 41 L.Ed.2d 935 (1974) (citation omitted).
 

 “[CJourts are ill equipped to deal with the increasingly urgent problems of prison administration and reform.” [Procu
 
 nier v. Martinez,
 
 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974) ], at 405 [94 S.Ct. at 1807]. As the
 
 Martinez
 
 Court acknowledged, “the problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree.”
 
 Id.,
 
 at 404-405 [94 S.Ct. at 1807]. Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. Prison administration is, moreover, a task that has been committed to the responsibility of those branches, and separation of powers concerns counsel a policy of judicial restraint. Where a state penal system is involved, federal courts have, as we indicated in
 
 Martinez,
 
 additional reason to accord deference to the appropriate prison authorities. See
 
 Id.,
 
 at 405 [94 S.Ct. at 1807].
 

 Turner v. Safley,
 
 482 U.S. 78, 84-85, 107 S.Ct. 2254, 2259, 96 L.Ed.2d 64 (1987).
 

 No court has found probe searches of prisoners to be unconstitutional as a matter of law. Routine probe searches have been accepted as to the highly resourceful inmates of the Marion federal penitentiary,
 
 Bruscino v. Carlson,
 
 854 F.2d 162, 164 (7th Cir.1988); as to death row inmates held in the IMU at Washington State Penitentiary,
 
 Jeffries v. Reed,
 
 631 F.Supp. 1212, 1216-17 (E.D.Wash.1986); and as to inmates appearing in state court,
 
 State v. Hartzog,
 
 96 Wash.2d 383, 392, 635 P.2d 694 (1981). Neither the Fourth, Eighth, nor Fourteenth Amendments expressly regulate rectal probe searches. The question then becomes whether the probe policy is unreasonably harsh in light of legitimate state interests in prison security.
 

 Under
 
 Turner v. Safley, supra,
 
 “[w]hen a prison regulation impinges on inmates’ constitutional rights, the regulation is valid if it is reasonably related to legitimate pe-nological interests.”
 
 Id.,
 
 482 U.S. at 89, 107 S.Ct. at 2261. The Court in
 
 Turner
 
 enunciated four factors in weighing the “reasonableness” of a prison regulation:
 

 First, there must be a “valid, rational connection” between the prison regulation and the legitimate governmental interest put forward to justify it.- Thus, a regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational. Moreover, the governmental objective must be a legitimate and neutral one. We have found it important to inquire whether prison regulations restricting inmates’ First Amendment rights operated in a neutral fashion, without regard to the content of the expression.
 

 A second factor ... is whether there are alternative means of exercising the right that remain open to prison inmates. Where “other avenues” remain available for the exercise of the asserted right, courts should be particularly conscious of the “measure of judicial deference owed to corrections officials ... in gauging the validity of the regulation.”
 

 A third consideration is the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally. In the necessarily closed environment of the correctional institution, few changes will have no ramifications on the liberty of others or on the use the prison’s limited resources for preserving institutional order. When accommodation of an asserted right will have a significant “ripple effect” on fel
 
 *1285
 
 low inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials.
 

 Finally, the absence of ready alternatives is evidence of the reasonableness of a prison regulation. By the same token, the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an “exaggerated response” to prison concerns. This is not a “least restrictive alternative” test: prison officials do not have to set up and shoot down every conceivable alternative method of accommodating the claimant’s constitutional complaint. But if an inmate claimant can point to an alternative that fully accommodates the prisoner’s rights at
 
 de minimus
 
 cost to valid peno-logical interests, a court may consider that as evidence that the regulation does not justify the reasonable relationship standard.
 

 Id.,
 
 at 89-91, 107 S.Ct. at 2261-62 (citations omitted).
 

 The Defendants adequately demonstrate that there is a “valid, rational connection” between the search policy and the legitimate governmental interest — the safety and order of institution. The Affidavit of Reed indicates the unique role of the Intensive Management Unit (“IMU”), which houses “inmates with an extremely violent history
 
 [4]
 
 or with special needs.” Affidavit of Reed at 3. A study attached to the Affidavit of Reed documents the decrease in overall prison violence based upon the segregation of the extremely violent from the general population. Appendix C to Affidavit of Reed;
 
 see
 
 also Affidavit of Reed at 4-5; Affidavit of Blodgett at 2-3. Mr. Reed, the former Secretary of the Department of Corrections, further notes that “[sjince contraband, such as lethal weapons, dangerous drugs, and escape aids, have been carried by inmates in their rectal cavities in the past, it is a penologi-eally sound practice to ensure that this means of concealment not be overlooked.” Affidavit of Reed at 5. Furthermore,
 

 It is important to note that not everyone who smuggles contraband into an institution does so voluntarily. Weaker inmates are often targeted as “mules” or “packers”. They smuggle contraband because they are intimidated into doing so because of threats to themselves or others. Therefore, a strictly enforced search program is absolutely essential to prevent this type of intimidation and extortion from taking place. Thorough and effective searches give these weaker inmates the ability to say no when predators approach them and ask them to smuggle contraband. A strict search policy also makes it less likely that these inmates will be asked.
 

 Affidavit of Reed at 8.
 

 The Affidavit of Blodgett (Superintendent of the Washington State Penitentiary) documents and appends specific instances of contraband smuggled in inmates’ rectal cavities. Affidavit of Blodgett at 4; Appendix D. Some of the rectally smuggled objects include a knife with 4 inch handle and 4 inch blade, and a separate 4 inch hacksaw blade; 19 balloons (in a single incident) containing suspected narcotics
 
 [5]
 
 ; tobacco and matches; 4 balloons and a syringe and needle; 8 balloons of marijuana and 1 of methedrine; tobacco, matches and cigarette papers. WCC Captain Fleming also submits an affidavit documenting three particular rectal smuggling incidents, two of which were discovered through the routine probe search prior to placement in the IMU. One of these incidents involved a prisoner who, like the Plaintiff, was being transferred direct from the Washington State Penitentiary IMU to the WCC IMU. Affidavit of Fleming at 4 and Appendix B. The Defendants also states (without support by affidavit, but also without contradiction by Plaintiff) that the Plaintiff was found in June 1989 to have himself at
 
 *1286
 
 tempted to smuggle marijuana in his rectum.
 

 The second
 
 Turner
 
 factor, “whether there are alternative means of exercising the right that remain open to prison inmates”, is not clearly applicable to the case at hand given that the right to be free from cruel and unusual punishment, to be free from unreasonable searches and seizures, and to due process prior to the deprivation of life, liberty or property, are not affirmative rights but rather protections. The second
 
 Turner
 
 factor, the “alternative means of exercising” these rights, may more appropriately be considered through analysis of the third and fourth
 
 Turner
 
 factors.
 

 The third factor is “the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally.” The fourth factor is the “absence of ready alternatives”. In the context of a rectal probe search policy, these factors may be discussed together. Full “accommodation”, abandonment of routine rectal probe searches on prisoners entering the IMU, would obviously have resulted in missing the smuggled contraband in two of the incidents chronicled by Captain Fleming. Less apparent is the effect the policy had in discouraging rectal smuggling (and pressure upon “weaker” inmates to act as “mules”). It is perhaps inferable from the number of rectal incidents chronicled by Superintendent Blodgett prior to the advent of the policy that the policy was successful in discouraging rectal smuggling
 
 [6]
 
 . Certainly, the Plaintiff has not presented any evidence to contradict the asserted effectiveness of the policy, nor to suggest that the passage of some amount of drugs or other contraband would not have a serious impact on the security of the institution.
 

 The Defendants note that certain alternatives, particularly visual examination, frisk, x-rays, ultrasound and feces watch (or “dry cells”), are less effective or far more burdensome (in terms of limited institution resources) than the probe search policy. Mr. Reed noted that visual searches or frisks would not discover rectally smuggled contraband. Affidavit of Reed at 5. X-rays would not discover smuggled drugs, and are to some degree ineffective at detecting nonferrous items.
 
 Id.;
 
 Affidavit of Blod-gett at 4. Mr. Reed states that the requirement of ingestion of up to one-quart of water per inmate makes the ultrasound technique cumbersome. Affidavit of Reed at 6. Mr. Blodgett mentions that ultrasound too has limits on its effectiveness in detecting drugs. Affidavit of Blodgett at 4. Feces watch would require continuous surveillance of an individual inmate for 2 to 4 days, an obvious and substantial man-hour drain. Affidavit of Reed at 6; Affidavit of Blodgett at 5.
 

 The Plaintiff has contradicted none of these points. It is noted that the Defendants have in fact modified the policy of routine probe search prior to placement in the IMU, but such might have been under the pressure of numerous prisoner lawsuits or other considerations not at issue in this case. It is not necessary for the Defendants to demonstrate that a particular policy contracting the sphere of inmates’ rights is absolutely essential, only that it is reasonably related to a legitimate penological interest.
 

 II. Probe Search as Conducted
 

 Because the Plaintiff has not shown the existence of material disputed fact as to the constitutionality of the probe search policy, the question becomes whether the Plaintiff’s rights were violated by the search as it was performed upon him. The mere fact that the policy itself was “reasonable” under
 
 Turner
 
 would not prevent a brutally performed, unsanitary or purposefully humiliating search from being an unreasonable search under the Fourth Amendment or a wanton infliction of pain violative of the Eighth Amendment.
 
 Compare, Vaughan v. Ricketts,
 
 859 F.2d 736 (9th Cir.1988), in which it was held “that it was clearly established by 1984 that body cavity searches of inmates must be con
 
 *1287
 
 ducted in a reasonable manner, and that issues of privacy, hygiene, and the training of those conducting the searches are relevant to determining whether the manner of search was reasonable.”
 
 Id.,
 
 at 741.
 

 The Plaintiff does not specifically assert that the search was unreasonable, but mentions he had been transferred from the IMU at Washington State Penitentiary and had not been out of the custody of corrections officers and that he suffered “enormous pain”. The Plaintiff also implies, without definitively asserting, that the search was performed in unsanitary conditions.
 

 As was noted in the Affidavit of Fleming, another inmate being transferred directly from the WSP IMU to the WCC IMU, like the Plaintiff, was discovered to be carrying contraband in his rectal cavity. Affidavit of Fleming at 5-6. Moreover, Captain Fleming notes that the transfer of the Plaintiff with other inmates was not exactly uneventful and could well have offered the Plaintiff an opportunity to obtain smuggleable contraband.
 
 Id.,
 
 at 6-7. Based upon the undisputed facts, then, it was not unreasonable to search the Plaintiff again upon his arrival at WCC.
 

 While the Plaintiff alleges experiencing pain, he does not state that the search was performed brutally, or that the search was performed wantonly or with the intent of causing pain. The allegation of pain alone does not suggest that the search was performed unreasonably. It is further noted that Defendant Rich’s Affidavit relates that
 

 [i]f an inmate had appeared to me to be in enormous pain or attempted to move during the search, I would stop the procedure and explain to the inmate how he could minimize any discomfort. If in my medical opinion the amount of discomfort indicated that the search should not be conducted for medical reasons, I would have immediately stopped.
 

 Affidavit of Rich at 6. He used a lubricant on a rubber glove to perform the search, and performed rectal searches with attention to any conditions which would “contraindicate” such a search (e.g. external hemorrhoids).
 
 Id.,
 
 at 4. There is nothing in the Plaintiffs allegations of pain to indicate that the search was performed unreasonably.
 

 As noted above, the Plaintiff does not specifically allege unhygienic conditions. His Complaint states:
 

 Plaintiff asked defendant Lt. Watkins and Sgt. Gatchett why this Rectal Probe was not performed in the hospital where conditions were sanitary, instead of the room where a filthy mattress lay on the floor and not even a table existed for the physician to put any equipment on such as; the gloves, or the lubricant which laid on the floor.
 

 Complaint at 4. The Affidavits submitted by the Defendants state that at the time the Plaintiff was searched, the mattress placed in the rectal search room was nearly new and had a “fresh cover ... placed over this mattress on a regular basis.” Affidavit of Sills at 2. The Affidavits of Sills and Rich suggest that the Plaintiff came in no contact with the mattress — that it was placed in the search room on the chance that an inmate resisting the search had to be immobilized; i.e., as a “soft landing place”. Affidavit of Sills at 2. The Plaintiff did not resist and his Complaint does not suggest that he contacted the mattress. The Plaintiff does not allege that the room was dirty; the affidavits state that the room was regularly sanitized. Affidavit of Sills at 1-2 and 4; Affidavit of Rich at 7. The Defendants do not deny that the box of latex gloves used for the search was placed on the floor, nor that the lubricant tube was placed on the floor. Nonetheless, Defendant Rich avers that the glove and the lubricant applied to each inmate was sanitary, and was disposed after each search. Affidavit of Rich at 7. The Plaintiffs con-clusory allegations of insanitary conditions do not establish a genuine factual dispute as to hygiene. The Plaintiff has not demonstrated that the search was unreasonably performed.
 

 An action under 42 U.S.C. § 1983 must be founded upon a wrong of constitutional dimension. The Plaintiff has failed to demonstrate the existence of disputed
 
 *1288
 
 facts amounting to a constitutional violation.
 
 [7]
 
 The Plaintiffs second claim, alleging as to the rectal probe a violation of state law (“attempted assault and battery”) is frivolous in light of recognized constriction of the rights of inmates as a consequence of incarceration, and is not within the jurisdiction of this court in the absence of a legitimate federal claim arising from the same event.
 
 United Mine Workers v. Gibbs,
 
 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Accordingly, the undersigned must recommend that summary judgment be granted in favor of the Defendants and this action dismissed (each party to bear his own costs).
 

 [1]
 

 . A cause of action under 42 U.S.C. § 1983 must assert (1) that the defendants acted under color
 
 *1283
 
 of state law, and (2) that the defendants’ conduct deprived the plaintiff of a constitutional right.
 
 Balistreri v. Pacifica Police Dept.,
 
 901 F.2d 696, 699 (9th Cir.1990);
 
 Rinker v. Napa County,
 
 831 F.2d 829, 831 (9th Cir.1987).
 

 [2]
 

 . "The moving party is ‘entitled to judgment as a matter of law' [when] the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.”
 
 Celotex v. Catrett,
 
 477 U.S. 317, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986).
 

 [3]
 

 . A rectal probe search is defined as an “[¡Inspection for contraband or any foreign item in a body cavity of an offender using the fingers or simple instruments such as an otoscope, tongue blade, short nasal speculum or a simple forceps.” DOC Policy Directive 420.110 (10/1/85).
 

 [4]
 

 . The Affidavit of Blodgett appends documentation of inmates referred to the IMU. Some IMU inmates have a history of involvement in drug and weapons rings, extortion, stabbings, staff assault, escape, substance abuse, arson, etc., while in the prison general population. Affidavit of Blodgett, Appendix C.
 

 [5]
 

 . There is no follow up report in Appendix D regarding the contents of the 19 balloons.
 

 [6]
 

 . It might also be noted that the incident in which the plaintiff was allegedly found to be carrying marijuana in his rectum occurred after the rectal probe policy at issue here was eased.
 

 [7]
 

 . If the plaintiff was unaware of his obligation to present counter affidavits or other contradict- . ing evidence
 
 (see Klingele v. Eikenberry,
 
 849 F.2d 409, 411-12 (9th Cir.1988)), he may present such to the court along with his opposition (if any) to this Report. The ten day notice requirements of FRCP 56(c) is fully consistent with the ten day period for filing opposition to the Report of a U.S. Magistrate Judge. 28 U.S.C. § 636(b)(1). If necessary, an extension of time may also be considered by the court.