# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| In the Matter of the Detention of: | No. 54361-3-II |
|---|---|
| M.S., | |
| Petitioner. | UNPUBLISHED OPINION |

LEE, C.J. — M.S. appeals the superior court's 90-day involuntary commitment order. M.S. argues that he was denied his right to a fair trial because the superior court commissioner ordered him to appear in partial restraints for his civil commitment hearing. M.S. also argues that the superior court's finding that he was gravely disabled is not supported by substantial evidence.

We hold that the superior court commissioner did not err by ordering M.S. to appear at his civil commitment partially restrained. We also hold that the superior court's finding that M.S. was gravely disabled under RCW 71.05.020(23)(b) is supported by substantial evidence in the record. However, the superior court's finding that M.S. was gravely disabled under RCW 71.05.020(23)(a) is not supported by substantial evidence in the record. Accordingly, we affirm the superior court's 90-day commitment order, but remand for the trial court to strike the finding of grave disability under RCW 71.05.020(23)(a).

## FACTS

### A.    BACKGROUND

The State charged M.S. with third degree assault for an incident occurring at a pharmacy in King County. On October 16, 2019, the King County Superior Court dismissed M.S.'s criminal

charge without prejudice because it found M.S. incompetent to stand trial. The court ordered that M.S. be evaluated at Western State Hospital for civil commitment.

On October 28, 2019, the State petitioned for 180-days of involuntary treatment, alleging that M.S. was gravely disabled. The petition also alleged that, due to M.S.'s behavioral health condition, he posed a substantial likelihood of repeating acts similar to the felony with which he was charged.

B.      PRETRIAL MOTION AND HEARING

The State filed a pre-trial motion requesting that M.S. be partially restrained for his civil commitment hearing. A superior court commissioner held a hearing on the motion, but M.S. was not in the courtroom for the hearing.

At the hearing on the State's motion, Stacy Brymer, a registered nurse at Western State Hospital, testified that M.S. should be restrained for the hearing. Brymer testified that M.S was a "flight risk" and "very hard to redirect." Verbatim Report of Proceedings (VRP) (Nov. 12, 2019) at 10. Brymer cited a previous incident where M.S. tried to escape during a medical appointment. Brymer also testified that M.S. becomes hostile when discussing medications and that he was angry at Dr. Mary Cason. Brymer cited her concerned for Dr. Cason's safety at the hearing because of M.S.'s close proximity to the witness stand and due to the nature of the proceeding.

Dr. Cason, a psychiatrist at Western State Hospital, testified that M.S. has a history of being "borderline assaultive" during his stay at the hospital. VRP (Nov. 12, 2019) at 13. Dr. Cason cited an incident at a recent competency evaluation where M.S. grabbed the evaluator's wrist, slapped the evaluator's hand, and blocked her from exiting the room, which required staff intervention.

Dr. Cason also testified that M.S. poses an escape risk. M.S. has a history of attempted escapes from the hospital. Dr. Cason cited one instance where M.S. broke a window, jumped out, and escaped. Dr. Cason also cited an incident where M.S. attempted to escape during a dental appointment. Also, hospital staff had found "sheets torn up in [M.S.'s] room which apparently somehow helped him elope in the past." VRP (Nov. 12, 2019) at 15.

The State argued that M.S. should be allowed to have one of his arms released from the restraints. The State stated that its position was based on a desire to not interfere with M.S.'s ability to communicate with his attorney.

The superior court commissioner noted the layout of the courtroom on the record. The commissioner stated that M.S. would be seated only four feet from the exit. The commissioner also stated that M.S. would be seated only 15-18 feet from where Dr. Cason would be seated for her testimony. The commissioner further stated that the courtroom chairs were not bolted to the floor, which posed another security concern..

The superior court commissioner found that both witnesses were reasonably fearful of M.S. The commissioner also found that Dr. Cason in particular had reason to fear for her safety given her history with M.S. The commissioner acknowledged that no jury would be present for the proceeding and stated that the court could fairly decide the case.

The superior court commissioner ordered M.S. to be partially restrained for the hearing, but allowed one arm to be unrestrained so that M.S. may communicate with counsel. M.S. then entered the courtroom in partial restraints.

C.     TESTIMONY AT THE COMMITMENT HEARING

Deputy Earl Seratt is a deputy sheriff for the King County Sheriff's Office and testified to the incident that led to M.S.'s detention. Deputy Seratt responded to a disturbance at a pharmacy on December 1, 2018. M.S. was already detained when Deputy Seratt arrived on the scene. Deputy Seratt testified that, based on his experience, M.S. was exhibiting behavior consistent with a behavioral health crisis, including muttering, making incoherent statements, and moving in a robotic fashion. Deputy Seratt also observed that M.S. had open, oozing sores throughout his body.

Dr. Cason testified as to her evaluation of M.S.'s condition. Dr. Cason diagnosed M.S. with schizoaffective disorder. M.S. exhibits symptoms of psychosis, which include responding to internal stimuli such as hearing voices. M.S. has a co-existing mood disorder where he exhibits symptoms of ongoing hypomania, instability of mood, disorganized speech and thinking, physical agitation and restlessness, and an elevated mood or grandiosity flare into his thinking. These symptoms were present at the time of M.S.'s arrest. Dr. Cason also noted that M.S. claimed that he went to the pharmacy on the day of his arrest because his grandfather shared the same initials with the store. Placing meaning on random, unrelated connections is reflective of a behavioral health illness. These symptoms were still present, especially when limits were placed on M.S.'s behavior or when he received answers to questions that he did not like.

Dr. Cason also testified that M.S. exhibits very poor judgment. M.S. lacks the insight into the fact that he suffers from a behavioral health disorder. M.S. consistently refuses to take antipsychotic medication, but antipsychotic medication is necessary to treat M.S.'s schizoaffective disorder. M.S. does take other medications; however, those medications are taken on an "as

4

needed" basis and do not treat his underlying behavioral health disorder. VRP (Nov. 12, 2019) 37.

Dr. Cason testified that M.S.'s behavioral health disorder interferes with his ability to provide for his basic health and safety needs. Although M.S. is able to complete activities of daily living in the structured environment of the hospital, Dr. Cason had concerns about M.S.'s ability to engage in those activities if he were released, citing to M.S.'s inability to cooperate with requested dental care on two separate occasions. It was Dr. Cason's professional opinion that it would be difficult for M.S. to meet his essential human needs without further treatment. M.S. would have to show a remission of symptoms in order to be ready for a less restrictive alternative and that he needed further treatment at the hospital. Dr. Cason also noted that M.S. was in his ninth hospitalization at Western State Hospital since 2004.

M.S. testified to his desire to be released from civil commitment. M.S. testified that he had several housing options available upon discharge, which included his mother's condo, his sister's apartment, motels in Seattle, and his grandparent's cabin. He could stay with relatives on a trial basis. M.S. also testified that he had financial resources upon discharge. He could access Social Security Insurance (SSI) and Supplemental Nutritional Assistance Program (SNAP) benefits. M.S. also noted that he had $1480.00 in savings. Although M.S. was not currently receiving any benefits, he would be able to reinstate benefits upon release.

M.S. acknowledged that he has a "mild version of the [sic] mental illness," but that it was something he could manage day to day. VRP (Nov. 12, 2019) at 55. He also acknowledged that he had been hospitalized before because of his behavioral health illness. M.S. stated that he would

refuse antipsychotic medication if released, but instead use antibiotics and sleep aids to manage his behavioral health condition.

D.     COMMITMENT ORDER AND REVISION BY SUPERIOR COURT

The superior court commissioner found that that M.S. had committed a third degree assault at the pharmacy. The commissioner also found that M.S. presented a substantial likelihood of repeating similar acts because of his behavioral health disorder. The commissioner further found that M.S. is gravely disabled because of his behavioral health disorder. Specifically, the commissioner found that, because of his behavioral health disorder, M.S. is in danger of serious physical harm resulting from the failure to provide for his essential human needs of health and safety. The commissioner also found that M.S. manifested a severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his actions and that he is not receiving the essential care he needs. Based on its findings, the commissioner entered a 180-day commitment order.

M.S. filed a motion to revise the commissioner's 180-day commitment order. The superior court granted M.S.'s motion to revise in part, finding that M.S. did not pose a substantial likelihood of repeating similar acts that led to his criminal charge.[1] The superior court denied M.S.'s motion

---

[1] M.S. argues on appeal that the superior court commissioner erred in finding that he posed a substantial risk of committing similar offenses under RCW 10.77.086(4). However the superior court granted M.S.'s motion to revise the finding that M.S. did not pose a substantial likelihood of repeating similar acts that led to his criminal charge. Thus, M.S.'s argument is moot because the superior court commissioner's ruling has already been reversed by the superior court. *In re Det. of M.K.*, 168 Wn. App. 621, 625, 279 P.3d 897 (2012) ("appeal is moot where it presents merely academic questions and where this court can no longer provide effective relief.").

to revise with respect to the trial court's finding of grave disability. As a result of the revision, the court entered a 90-day commitment order.

M.S. appeals the superior court's 90-day involuntary commitment order.

ANALYSIS

A.    PARTIAL RESTRAINTS

M.S. argues that the superior court commissioner erred in ordering him to appear partially restrained because the evidence does not show any safety concerns or risk of escape. In so arguing, M.S asks us to extend the criminal standard prohibiting the use of restraints in court proceedings to civil commitment hearings. We need not adopt a general rule prohibiting restraints in civil commitment hearings based on the facts presented because regardless of any applicable rule, the evidence here showed that M.S. was an escape and safety risk.

1.    Standard to Restrain in the Civil Commitment Process

No Washington court has considered the standard for imposing restraints on respondents in involuntary commitment proceedings. However, "'[i]t is well settled that a defendant in a criminal case is entitled to appear at trial free from all bonds or shackles except in extraordinary circumstances.'" *State v. Jackson*, 195 Wn.2d 841, 852, 467 P.3d 97 (2020) (alterations in original) (quoting *State v. Finch*, 137 Wn.2d 792, 842, 975 P.2d 967, *cert. denied*, 528 U.S. 922 (1999)). In criminal cases, our Supreme Court has determined that restraints are disfavored even when there is no jury present because "'they may abridge important constitutional rights, including the presumption of innocence, privilege of testifying in [sic] one's own behalf, and right to consult with counsel during trial.'" *Id.* (quoting *State v. Hartzog*, 96 Wn.2d 383, 398, 635 P.2d 694 (1981)).

Other jurisdictions have extended the rule prohibiting the use of restraints, except in extraordinary circumstances, to civil commitment proceedings. *See In re Benny M.*, 2017 IL 120133, ¶33-36, 104 N.E.3d 313, 422 Ill. Dec. 746; *In re T.J.F.*, 2011 MT 28, ¶27-28, 359 Mont. 213, 248 P.3d 804. In *Benny M.*, the Illinois Supreme Court held that trial courts may order physical restraints in involuntary treatment proceedings only upon a finding of manifest necessity. 2017 IL at ¶34. A finding of manifest necessity for restraints must be based on the risk of flight, threats to the safety of people in the courtroom, or maintaining order during the hearing. *Id.* The Illinois Supreme Court reasoned that

> [w]hile involuntary treatment proceedings do not involve a presumption of innocence, the other concerns weighing against unnecessary use of restraints in criminal and juvenile delinquency proceedings also apply here. A respondent's ability to assist counsel and the dignity of the court proceedings are important concerns in involuntary treatment proceedings, and those interests may be impacted by unnecessary restraints the same as in criminal and juvenile delinquency proceedings.

*Id.* at ¶33. Likewise, the Montana Supreme Court has held that "in an involuntary commitment proceeding before a district court sitting without a jury, there must be a showing on the record that restraints are needed before the District Court may order them." *T.J.F.*, 2011 MT at ¶28.

Here, both the appellant and respondent seem to assume that the criminal standard applies to civil commitment proceedings. But deciding whether or not to extend the criminal standard to the civil commitment process requires us to consider the nature and source of the right to appear unrestrained.

The criminal standard comes from a defendant's right to appear and defend in person. *See* WASH. CONST. Art. I, §22; *Jackson*, 195 Wn.2d at 851. But this constitutional standard applies to criminal prosecutions, not civil commitment proceedings. *See* WASH. CONST. Art. I, §22.

However, the right to appear unrestrained also implicates due process concerns under the Fourteenth Amendment of the United States Constitution. *Jackson*, 195 Wn.2d at 852. Therefore, a respondent's right to be free from restraint at a civil commitment hearing must be based on due process principles and cannot simply be imported from criminal law.

When determining due process rights, we utilize the balancing test from *Mathews v. Eldridge*, 424 U.S. 319, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976). *In re D.E.*, 196 Wn.2d 92, 102, 469 P.3d 1163 (2020). Under this test, we balance (1) the private interests affected, (2) the risk of erroneous deprivation of the private interest created by the procedures used, and (3) the State's interest in using the challenged procedure. *Mathews*, 424 U.S. at 335.

Here, the parties did not brief whether there is a due process right to appear unrestrained in a civil commitment hearing under *Mathews*. However, there are some fundamental differences that may make it unworkable, or at least unwise, to simply import the criminal test to the civil commitment process. The parties do point out that the due process clause guarantees the right to be free from bodily restraint, especially to those civilly committed. *See Youngberg v. Romero*, 457 U.S. 307, 315-16, 102 S. Ct. 2452, 73 L. Ed. 2d 28 (1982). But the interest at stake in a civil commitment proceeding is different than the liberty interest at stake in most criminal proceedings. For example, unlike the criminal code, the civil commitment process, although a significant deprivation of liberty, is not meant to be punitive; rather, it is meant to be beneficial to the detainee and to the public as a whole. *In re Det. of V.B.*, 104 Wn. App. 953, 960, 19 P.3d 1062 (2001).

Additionally, risk of erroneous deprivation warrants different considerations than the rights of the accused in a criminal trial. Chapter 71.05 RCW contains numerous procedural safeguards which minimize the risk of an erroneous deprivation of liberty. For example, the series of

evaluations and hearings that chapter 71.05 RCW mandates guards against holding a detainee who is not mentally ill and dangerous or gravely disabled at the time of the decision to continue detention. If a respondent is found to be gravely disabled, then they are typically held to commitment for a short duration lasting up to 90 or 180 days. RCW 71.05.280, .320.

And lastly, the State's interest in civil commitment proceedings is different than in criminal prosecutions. In a civil commitment proceeding, the State's interest is in protecting the public and in caring for those in need of mental health treatment. *V.B.*, 104 Wn. App. at 965. But in a criminal prosecution, the State has an interest in preventing substantial harm to individuals or the public and "to safeguard conduct that is without culpability from condemnation as criminal." RCW 9A.04.020(1)(a), (b).

In sum, balancing these factors would likely result in a slightly different standard than the one used in a criminal trial after taking into account the unique differences between involuntary commitment and criminal trials. Regardless, while involuntary commitment proceedings do not have a presumption of innocence, they do implicate some of the same important rights afforded to defendants in criminal proceedings, such as the ability to assist counsel and dignity of court proceedings. *Compare Benny M.*, 2017 IL at ¶33, *with Jackson*, 195 Wn.2d at 852. Because the facts of this case meet the heightened criminal standard, we decide this case based on the assumption, without affirmatively deciding, that the criminal standard applies here.

2.  Legal Principles

We generally review constitutional claims de novo. *Jackson*, 195 Wn.2d at 850. However, because the decision on whether to shackle a person is vested within the discretion of the trial court, we review the decision of whether to shackle for an abuse of discretion. *State v. Turner*,

143 Wn.2d 715, 724, 23 P.3d 499 (2001). A trial court abuses its discretion when its "'decision is manifestly unreasonable, or is exercised on untenable grounds, or for untenable reasons.'" *Id.* (quoting *State v. Blackwell*, 120 Wn.2d 822, 830, 845 P.2d 1017 (1993)).

In criminal cases, "the long-standing rule in Washington is that the right to appear and defend in person extends to both mental and physical faculties. This leads to the right 'to be brought into the presence of the court free from restraints.'" *Jackson*, 195 Wn.2d at 852 (quoting *State v. Damon*, 144 Wn.2d 686, 690, 25 P.3d 418 (2001)). "[R]egardless of the nature of the court proceeding or whether a jury is present, it is particularly within the province of the trial court to determine whether and in what manner, shackles or other restraints should be used." *State v. Walker*, 185 Wn. App. 790, 797, 344 P.3d 227 (addressing the defendant's right to be free from restraints at sentencing), *review denied*, 183 Wn.2d 1025 (2015). Restraints are disfavored because they may interfere with important constitutional rights, "'including the presumption of innocence, privilege of testifying in [sic] one's own behalf, and right to consult with counsel during trial.'" *Jackson*, 195 Wn.2d at 852 (quoting *Hartzog*, 96 Wn.2d at 398).

But a defendant's right to be in court free from restraints is not limitless. *Walker*, 185 Wn. App. at 800. The right may yield to courtroom safety, security, and decorum. *Id.* A defendant may be restrained if necessary to prevent injury, disorderly conduct, or escape. *Id.*

The trial court is vested with the discretion to provide for courtroom security in order to ensure the safety of court officers, parties, and the public. *Turner*, 143 Wn.2d at 725. The trial court must exercise its discretion in determining the extent to which courtroom security measures are necessary and its decision must be founded upon a factual basis set forth in the record. *Jackson*, 195 Wn.2d at 852-53. The trial court should allow restraints only after conducting a hearing and

entering findings on the record sufficient to justify their use on a particular defendant. *Walker*, 185 Wn. App. at 800. Failing to exercise its discretion is constitutional error. *See State v. Clark*, 143 Wn.2d 731, 775, 24 P.3d 1006, *cert. denied*, 534 U.S. 1000 (2001).

3.      The Use of Partial Restraints Was Permissible

M.S. argues that the superior court commissioner erred by deciding on the necessity of restraints only after he had already appeared in shackles in the courtroom. The record fails to support this argument.

Here, the record demonstrates that the superior court commissioner took evidence on the need for restraints and made a determination on the necessity of restraints prior to M.S. appearing before the court. Because the record contradicts M.S.'s argument that the court only conducted an inquiry after he arrived at the courtroom in shackles, we reject his argument.

M.S. also argues that the superior court commissioner erred in ordering him to appear in partial restraints because the evidence does not show any safety concerns or risk of escape. We disagree.

Here, the evidence demonstrates that M.S. was an escape risk. Brymer testified that M.S. previously tried to escape from the hospital during one of his medical appointments. Dr. Cason also cited a previous escape attempt where M.S. broke a window at the hospital and jumped out. Additionally, Dr. Cason testified that M.S. made an escape attempt during a dental appointment a week prior to the civil commitment hearing. The superior court commissioner also made a record of the layout of the courtroom in relation to flight concerns, noting that M.S. would be seated about four feet from the exit. Based on the testimony that M.S. had made repeated attempts to escape

and M.S.'s proximity to the courtroom exit, the commissioner did not abuse its discretion in determining that M.S. was an escape risk. *See Turner*, 143 Wn.2d at 724.

The evidence also demonstrates that M.S. posed a threat to witness safety. Brymer testified that she was concerned for Dr. Cason's safety due to the proximity of M.S. to the witness stand in the courtroom and because M.S. has a history of becoming hostile when discussing medication. Dr. Cason testified that she was concerned about M.S. being unrestrained for the civil commitment hearing because M.S. has a history of being borderline assaultive during his time at the hospital. Dr. Cason cited to an incident during a competency evaluation where M.S. grabbed the evaluator's wrist, slapped her hand, and prevented her from leaving the room. And the superior court commissioner made a record of the layout of the courtroom in relation to safety concerns, noting that the courtroom was compact and that the chairs were not secured to the floor. Based on the testimony and the layout of the courtroom, the commissioner did not abuse its discretion in determining that M.S. posed a threat to safety. *See Turner*, 143 Wn.2d at 724.

The evidence demonstrates that M.S. was an escape risk and posed a threat to witness safety. The superior court commissioner balanced the risks posed with M.S.'s right to consult with counsel by ordering one arm be unrestrained. And the commissioner acknowledged that no jury would be present for the proceeding and that the court could fairly decide the case. Given this record, the commissioner did not abuse its discretion by ordering M.S. to appear in partial restraints.

B.    GRAVELY DISABLED

   1.    Legal Principles

 "Gravely disabled" means,

> a condition in which a person, as a result of a behavioral health disorder: (a) Is in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety; or (b) manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety.

RCW 71.05.020(23).[2]  Involuntary commitment is justified if the "gravely disabled" standard is met under either prong of RCW 71.05.020(23)(a) or (b).  *In re Det. of LaBelle*, 107 Wn.2d 196, 202, 728 P.2d 138 (1986).

In an involuntary commitment proceeding, the State has the burden of proving that a person is gravely disabled by clear, cogent, and convincing evidence.  *Id.* at 209.  This standard means that the State must show that it is "'highly probable'" that the person is gravely disabled.  *Id.* (quoting *In re Pawling*, 101 Wn.2d 392, 399, 679 P.2d 916 (1984)).

Where sufficiency of the evidence is challenged, we review the facts in the light most favorable to the prevailing party.  *In re Det. of Kelley*, 133 Wn. App. 289, 295, 135 P.3d 554 (2006), *review denied*, 159 Wn.2d 1019 (2007).  On appeal, "we will not disturb the trial court's findings of 'grave disability' if supported by substantial evidence which the lower court could reasonably have found to be clear, cogent and convincing."  *Labelle*, 107 Wn.2d at 209.

---

[2] At the time of M.S.'s involuntary commitment hearing, former RCW 71.05.020(22) (2019) defined "gravely disabled."  Former RCW 71.05.020(22) was recodified in 2020 as RCW 71.05.020(23), which is the current version of the statute.  *Compare* Laws of 2019, ch. 446, sec. 2 *with* Laws of 2020 ch. 302, sec. 3.  The current version of RCW 71.05.020 defining "gravely disabled" is used because the recodification did not change the definition.

2.      Severe Deterioration in Routine Functioning and is Not Receiving Care

M.S. argues that "the evidence was insufficient to show how any alleged loss of cognitive or volitional control had interfered, or would interfere, with [his] ability to care for his own health and safety needs." Br. of Appellant at 21. We disagree.

RCW 70.05.020(23)(b) states that a person is gravely disabled if, because of a behavioral health disorder, he "manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety." RCW 71.05.020(23)(b) "permits the State to treat involuntarily those discharged patients who, after a period of time in the community, drop out of therapy or stop taking their prescribed medication and exhibit 'rapid deterioration in their ability to function independently.'" *LaBelle*, 107 Wn.2d at 206 (quoting Durham & LaFond, *The Empirical Consequences and Policy Implications of Broadening the Statutory Criteria for Civil Commitment,* 3 Yale L. & Pol'y Rev. 395, 410 (1985)).

To find that an individual continues to be gravely disabled within the meaning of RCW 71.05.020(23)(b), the evidence must show: (1) a severe deterioration in routine functioning and (2) failure to receive treatment that is essential for health or safety. *LaBelle*, 107 Wn.2d at 205. Regarding the first requirement, the State must show that the person is showing severe deterioration of routine functioning, evidenced by recent proof of loss of "significant" cognitive or volitional control. *Id.* at 208. Regarding the second requirement, "the evidence must reveal a factual basis for concluding that the individual is not receiving or would not receive, if released, such care as is essential for his or her health or safety." *Id.* The person must be unable to make a rational choice about his need for treatment because of a severe deterioration of behavioral health

functioning. *Id.* This creates a "causal nexus" between the person's severe deterioration in routine functioning and evidence that he would not receive essential care if he were released. *In re Det. of D.W.*, 6 Wn. App. 2d 751, 759, 431 P.3d 1035 (2018), *review denied*, 193 Wn.2d 1006 (2019).

Here, Dr. Cason testified that M.S. was in his ninth admission to Western State Hospital. Dr. Cason also noted that M.S. said he went to the pharmacy on the day of his arrest because his grandfather shared the same initials with the store; placing meaning on random, unrelated connections is reflective of a behavioral health illness. Dr. Cason also testified that disorganized speech and thinking were apparent at the time of M.S.'s arrest. M.S.'s disorganized speech and thinking were ongoing, especially when limits are placed on M.S.'s behavior. Deputy Seratt testified that M.S. appeared to be dirty and covered in open, oozing sores at the time of his arrest. Deputy Seratt also testified that M.S. was muttering, saying incoherent statements, and moving in a robotic fashion. Dr. Cason's and Deputy Seratt's testimony provided substantial evidence that clearly, cogently, and convincingly showed M.S.'s severe deterioration in routine functioning, reflecting a significant loss of cognitive or volitional control. *LaBelle*, 107 Wn.2d at 208.

The State also presented evidence that M.S. would not receive essential care for his health and safety if released from the hospital. M.S. continues to demonstrate poor judgment and lacks insight into the fact that he suffers from a behavioral health illness. M.S. testified that he will continue to refuse antipsychotic medications, but will use antibiotics and sleep aids to deal with his "mild version" of mental illness. VRP (Nov. 12, 2019) 55. However, Dr. Cason testified that antipsychotic medication is necessary to treat M.S.'s schizoaffective disorder. Dr. Cason's testimony shows that M.S. is unable to make a rational choice about his need for treatment because of his schizoaffective disorder. *LaBelle*, 107 Wn.2d at 208.

Dr. Cason's and Deputy Seratt's testimony provides substantial, recent evidence of M.S.'s severe deterioration in routine functioning which clearly, cogently, and convincingly shows that M.S. has a significant loss of cognitive or volitional control. Dr. Cason's testimony also demonstrates M.S.'s lack of understanding about his need for medication and mental health services due to his behavioral health disorder. Therefore, the State presented substantial evidence to clearly, cogently, and convincingly show that M.S. is gravely disabled under RCW 71.05.020(23)(b). Accordingly, we affirm the superior court's order involuntarily committing M.S. up to 90 days at Western State Hospital.

3.      Failure to Meet Essential Human Needs

M.S. argues that insufficient evidence supports the trial court's finding of grave disability because "the record lacks any evidence M.S. is at risk of serious physical harm resulting from a failure to provide for his essential human needs." Br. of Appellant at 20. We agree.

The first prong of the gravely disabled statute requires a showing that an individual is "in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety." RCW 71.05.020(23)(a). "[T]he State must present recent, tangible evidence of failure or inability to provide for such essential human needs as food, clothing, shelter, *and* medical treatment which presents a high probability of serious physical harm within the near future unless adequate treatment is afforded." *LaBelle*, 107 Wn.2d at 204–05 (emphasis added). "[T]he failure or inability to provide for these essential needs must be shown to arise as a result of a [behavioral health] disorder and not because of other factors." *Id.* at 205.

Here, M.S. acknowledged that he has a mild version of a mental illness, but that it was something he could deal with day to day. M.S. further testified that he had several housing options

available upon discharge, including his mother's condo, his sister's apartment, motels in the Seattle area, or his grandparents. M.S. noted that he could stay with relatives on a trial basis. M.S. also testified that had financial resources after his release, including SSI and SNAP benefits, and $1,480.00 in savings. Despite not currently receiving those benefits, he would be able to reinstate them upon release.

The State presented no recent, tangible evidence of M.S.'s failure or inability to provide food or shelter for himself. In fact, Dr. Cason testified that there "hasn't been any concern with regard to [M.S.] eating adequately or taking in enough water to sustain himself." VRP (Nov. 12, 2019) at 42. The only evidence presented by the State regarding M.S.'s ability to provide housing for himself was Dr. Cason's generalized testimony that "when people are not treated for mental illness for symptoms, they are usually even worse when not in a structured setting with the basics provided to them, like food and housing." VRP (Nov. 12, 2019) at 39. Even viewing the evidence in the light most favorable to the State, the State failed to meet its burden under RCW 71.05.020(23)(a) because it failed to present any recent, tangible evidence of M.S.'s failure to provide himself with food or shelter.

Based on the record, although the State presented substantial evidence that clearly, cogently, and convincingly shows that M.S. "manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety" under RCW 71.05.020(23)(b), the State failed to present any evidence of M.S.'s inability to secure food or shelter under RCW 71.05.020(23)(a). Therefore, even viewing the evidence in light most favorable to the State, the State did not present substantial evidence to clearly, cogently, and

No. 54361-3-II

convincingly show that M.S. is gravely disabled under RCW 71.05.020(23)(a). But because only one prong is needed to affirm the superior court's commitment order, and because M.S. is gravely disabled under RCW 71.05.020(23)(b), we affirm the superior court's 90-day involuntary commitment order.

## CONCLUSION

We affirm the superior court's 90-day commitment order, but remand to the trial court to strike the trial court's finding that M.S. is gravely disabled under RCW 71.05.020(23)(a).

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____, C.J.
Lee, C.J.

We concur:

_____
Worswick, J.

_____
Cruser, J.

19