IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 38554-0-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MATTHEW JEFFREY HOLT, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, C.J. — Matthew Holt was on trial for unlawful possession of a firearm in the first degree and the State was on the verge of resting its case when Mr. Holt pleaded guilty. Mr. Holt faced trial on far more serious human trafficking and related charges, and the State had agreed to recommend a 286-month sentence in that other matter and that his sentences in the two matters would run concurrently.

Mr. Holt later moved to withdraw his guilty plea in this case. When the motion was argued, he explained that the principal grounds were a claimed misunderstanding about his offender score and a concern that the State might not honor all of the promises made in exchange for his guilty plea in the human trafficking case. The trial court refused to allow Mr. Holt to withdraw the plea, finding it was knowingly and voluntarily entered.

For the first time on appeal, Mr. Holt argues he would not have entered his guilty plea had he not been shackled or otherwise restrained in some fashion in nine pretrial hearings. It is clear following *State v. Jackson*, 195 Wn.2d 841, 852, 467 P.3d 97 (2020)—a decision filed six months after his guilty plea—that in a handful of the pretrial hearings, the trial court failed to engage in a required individualized inquiry into the need for the restraints.

Given the evidence at Mr. Holt's trial, the plea agreement was not prejudicial, and the pretrial errors were harmless beyond a reasonable doubt. Nor does Mr. Holt demonstrate that the trial court abused its discretion in finding that his guilty plea was voluntary. We affirm.

## FACTS AND PROCEDURAL BACKGROUND

In August 2016, police initiated a traffic stop of a stolen vehicle in which Matthew Holt was a passenger. The occupants were ordered out of the car and a firearm magazine clip allegedly fell from Mr. Holt's lap onto the ground. A search of the car produced a firearm under the front passenger seat, which is where Mr. Holt had been sitting. Mr. Holt had earlier been convicted of second degree robbery, a serious offense, so for him to have possession of a firearm constituted unlawful possession of a firearm in the first degree. RCW 9.41.040(1)(a).

Based on the ammunition found in the vehicle stop, Mr. Holt pleaded guilty in federal court to unlawful possession of ammunition in May 2017. Later, the State

2

charged him with unlawful possession of a firearm in the first degree. He was arraigned in September 2017.

During this same time frame, a federal and state task force was investigating trafficking of juvenile and adult victims by the Tillicum Park Gangsters. Mr. Holt is alleged to have been a "higher up" member and even the "self-professed leader" of that gang. 12 Report of Proceedings (RP) at 62; 1 RP at 4.[1]

Early in the proceedings in this case, Mr. Holt's telephone privileges were severely limited by the jail for reasons related to human trafficking activities. At a hearing at which the trial court refused to reconsider the restrictions, a prosecutor represented that Mr. Holt was making phone calls using other offenders' personal identification numbers (PINs), and individuals were being charged with crimes based on criminal activity Mr. Holt conducted during the calls. The prosecutor described Mr. Holt as "nonstop" asking for money to be put on his books by women he referred to as his "bitch[es]." 2 RP at 5. In refusing to reconsider the telephone restrictions, the trial court commented that the evidence presented by the State supported its claims that Mr. Holt

---

[1] Sixteen separately-paginated verbatim reports of proceedings were filed in this case. We cite to five of them. 1 RP refers to a report of numerous proceedings that begins with proceedings on September 25, 2017; 2 RP refers to the report of proceedings taking place on November 28, 2017; 11 RP refers to the report of proceedings taking place on December 13, 2019; 12 RP refers to the report of proceedings taking place between January 2 and 13, 2020; and 16 RP refers to the report of proceedings taking place on April 17, 2020.

had abused telephone access "and he certainly utilizes the phones . . . to effectuate the commission of the acts with which he is charged." 2 RP at 7.

Sometime in 2017 or 2018, Mr. Holt was charged in a multi-defendant human trafficking case. He was charged with first and second degree human trafficking, conspiracy to commit first degree human trafficking, and promoting commercial sex abuse of a minor. Ten defendants had been charged in that case by the time of a trial readiness hearing held in that proceeding on August 10, 2018.

At the outset of the hearing, Mr. Holt assaulted one of his codefendants, Jamaal Pinkney, in the courtroom. Mr. Holt was removed, and the hearing proceeded in his absence.

This prosecution was scheduled to proceed to trial a month later, on September 10, 2018. The State filed a motion for an order requiring Mr. Holt to wear a stun belt during the trial, and on the trial date, Mr. Holt was brought to the courtroom in a restraint chair. The State's motion for use of a stun belt said that on most occasions when Mr. Holt had been brought to court he had been verbally disruptive. It described his actions at the prior month's readiness hearing as follows:

> Despite all of the security that was present, and despite the fact that [Mr. Holt's] legs and hands were shackled with metal handcuffs and chains, the defendant leaned into the closer of his co-defendants, who was seated in a chair at the time, said something like "snitch," spit directly at his co-defendant, and then swung his right arm as best as he could, directed at the face and head of the co-defendant. The defendant had to be forced to the

4

ground by multiple officers, and then had to [be] carried out of the courtroom.

Clerk's Papers (CP) at 39.

In addition to the State's motion for the restraint, the trial judge, the Honorable Jerry T. Costello, was presented with motions by Mr. Holt to dismiss the charge on double jeopardy grounds and for suppression of evidence of the firearm. The prosecutor also reported that Mr. Holt was seeking a change of his court-appointed lawyer, Kent Underwood. The parties agreed that the motion for replacement of Mr. Holt's lawyer would be heard first. When Judge Costello learned during argument of the motion that Mr. Holt wanted some 17 witnesses interviewed, which had not yet been done, he denied the motion to replace Mr. Underwood but granted a continuance of the trial. The issue of trial restraints was not reached.

Trial was next scheduled to proceed on October 15, 2018, before Judge Helen Whitener. In proceedings taking place that day and the next, Judge Whitener heard and denied the State's motion to require Mr. Holt to wear a stun belt during the trial, ruling that the belt's delivery of 50,000 volts of electricity when activated was inhumane and "the least restrictive means of controlling the defendant is to advise him that if he misbehaves during th[e] trial, the court will have him removed and placed in a room where he can watch the trial via closed circuit monitor." CP at 67. She denied Mr. Holt's double jeopardy motion. Judge Whitener granted Mr. Holt's motion to represent

5

himself and, because he would need additional time to prepare for trial, declared a mistrial. A few days later, Judge Stephanie A. Arend ruled that Mr. Underwood, who was representing Mr. Holt in the human trafficking case, would continue to serve as standby counsel in this case.

The next trial date in this case was January 14, 2019. It was continued by agreement of the parties to follow the trial in the human trafficking case. During the course of the hearing, the prosecutor told the court, and Mr. Holt did not disagree or object, that in a conversation between him and Mr. Holt

> [Mr. Holt] wants to talk with Mr. Underwood, [Greg] Greer [the prosecutor in the trafficking case], and I about resolving all of these things. And having the possession of a firearm charge a day after the trafficking makes a lot more sense to me than having the firearm case first.

1 RP at 15.

Reset trial dates in this matter in February 2019, April 2019, May 2019, August 2019, and September 2019 were all continued. The human trafficking case was also subject to repeated continuances. On the September 9, 2019 trial date in this case, the court scheduled Mr. Holt's then-pending motions for hearing on September 30, 2019. At Mr. Holt's request, the court set the trial in this matter for January 2, 2020.

December 13, 2019, was a presentment date for an order on many of Mr. Holt's motions. At the conclusion of that hearing, the prosecutor told the court:

6

> I can . . . tell the Court that it appears that Mr. Holt and I may have reached
> a resolution of this case in which he will be pleading guilty January 2nd
> to Possession of Firearm First Degree, but there are a couple details that
> have to be worked out between now and then before that will happen.

11 RP at 9.  Mr. Holt did not disagree.  *Id.*

The parties appeared before Judge Costello on the January 2, 2020 trial date.  They had not reached a plea agreement.  Mr. Holt said he was not ready for trial and requested a continuance.  He argued at length that he needed to retain an expert witness for his planned defense of diminished capacity.  He explained that on the night of the traffic stop, he was extremely intoxicated and was transferred by others from a blue car that contained no firearm, into the stolen white car, which did.  He told the court that Angelica Bryson, who was driving the stolen car when it was stopped, and Jesslyn Marks, the backseat passenger, would both testify that he was too intoxicated to have knowingly possessed the gun.  He argued that an expert on diminished capacity could express the opinion that he could not have knowingly had possession of the firearm given his level of intoxication.

Judge Costello denied the motion for multiple reasons.  He orally ruled that the omnibus order had not identified a defense of diminished capacity; that while the prosecution had been aware of Mr. Holt's intent to offer testimony that he was intoxicated, this was the first time Mr. Holt had informed the court and the State that he wished to obtain and present expert testimony; the request was made not in good faith,

but for purposes of delay; and the proposed testimony would not assist the trier of fact within the meaning of ER 702.

The case proceeded to a jury trial beginning Monday, January 6. Asked what security measures the State was requesting, a corrections officer told the court it was asking only that Mr. Holt's movements in the courtroom be restricted to where he was no more than touch distance ("one arm's distance") from the table. 12 RP at 170. The corrections officer suggested that if something needed to be handed forward or placed on the projector, Mr. Underwood could do it. The trial court granted the State's request. Voir dire began but was not concluded that day. After the prospective jurors were excused, the court explained that at the conclusion of the State's case in chief, it would give Mr. Holt a chance to make an offer of proof with his proposed witnesses outside the presence of the jury so the court could rule on the extent to which their testimony would be permitted.

Following selection of the jury, the State called four witnesses in its case in chief, all police officers. Officer Andrew Hall, a city of Lakewood police officer, testified that he had taken the stolen vehicle report on the white 2007 Chevrolet Malibu whose stop in August 2016 led to Mr. Holt's arrest. He testified that at the time he took the report, the victim consented to a search of the vehicle if it was recovered.

Lakewood Police Officer Maxwell Criss testified that he was on patrol on the graveyard shift on the early morning of August 16, 2017, when he recognized the stolen

Chevrolet Malibu as one he had seen listed on a hot sheet. He ran the license plate to confirm the car was still identified as stolen, and then notified dispatch. When the Malibu pulled into a gas station, Officer Criss followed it and activated his overhead lights and his spotlight, which he pointed into the vehicle.

Chris Burbank, a Tacoma police officer, was also working graveyard patrol that night. He testified that Tacoma has a mutual aid agreement with Lakewood, so when he heard Officer Criss's call, he drove toward his location and caught up with him before the gas station. Both officers testified that they conducted a felony traffic stop in which Officer Criss directed the driver, Ms. Bryson, to turn the car off, which she did. They then ordered the car's occupants to exit the car one by one and walk back to where they would be handcuffed. The occupants were ordered to keep their hands up and visible. Both officers testified that all of the occupants initially complied, but Mr. Holt, the front seat passenger, dropped his hands out of sight multiple times.

Officer Burbank was positioned where he could see all the way down the passenger side of the vehicle, and he testified that in response to Mr. Holt's noncompliance, he ordered him to put his hands outside the right front window. Mr. Holt violated that command as well. When Mr. Holt was ordered out of the car, Officer Burbank testified that he saw a black object fall from his lap onto the ground. It was square-shaped and from the sound of it hitting the ground it had some weight to it and sounded metallic. Officer Criss testified that he, too, heard something drop to the ground

9

when Mr. Holt got out of the car but he did not see what it was.  Officer Burbank approached the suspect vehicle to see what had fallen out of Mr. Holt's lap and saw that it was a black handgun magazine.  It was loaded.

Officer Hall was also working graveyard shift that night and responded to the report of the stolen car; he arrived after the passengers had already been ordered out of the vehicle.  All three officers were asked if they observed Mr. Holt stumbling, uneasy on his feet, or having difficulty getting out of the car, and none of them had seen these or other signs that Mr. Holt was intoxicated.

Officer Hall conducted a search of the Malibu.  Before entering the car, he saw the magazine located on the ground outside.  He found a firearm on the front passenger floorboard, under the passenger seat.  He found a box of ammunition in the glovebox.  Asked about the firearm's placement under the seat, Officer Hall testified it was located and oriented the way it would be if the front seat passenger had leaned over and placed it under the seat; its muzzle faced toward the back of the car and the grip was at an angle.  Nothing was obstructing access to the firearm.  The ammunition in the glove box was .380 caliber, which was the same caliber as the firearm.  He identified pictures he had taken at each step of the search.

Officer Hall transported Mr. Holt to the Pierce County Jail.  He testified that Mr. Holt did not appear to be intoxicated.  Booking staff at the jail can decline to accept a prisoner if he is intoxicated and they did not decline to take Mr. Holt.

10

Bryan Johnson, the forensic services manager for the Lakewood Police Department testified to having test fired the firearm found in the car and determined that it met the definition of a firearm under Washington law. He explained that to meet that definition, a firearm must expel a projectile by an explosive such as gunpowder. He tested the firearm using a reference magazine, and it functioned and fired successfully.

After calling its final witness on Thursday, January 9, the prosecutor informed the trial court that Mr. Holt had signed a stipulation establishing that he had previously been convicted of a serious offense in Washington, an element of the charge. The trial court accepted the stipulation. The prosecutor testified that the State would rest its case as soon as the stipulation was read. Jurors were told at the end of Thursday's proceedings that they were excused until Monday at 1:30 p.m.

On Monday morning, the State had arranged to have four of Mr. Holt's proposed witnesses at trial so that Mr. Holt could present his offers of proof. The four witnesses were Angelica Bryson, Jesslyn Marks, Shyanna Moffatte, and Jamaal Pinkney. The trial court had Mr. Holt proceed with his offers of proof.

Ms. Bryson's and Ms. Marks's testimony during the offers of proof, which is largely reproduced in an appendix, was much more harmful than helpful to Mr. Holt. While both women testified that Mr. Holt had been intoxicated the night of the vehicle stop, Ms. Bryson did not agree that he was "blackout drunk." 12 RP at 664. Both testified that Mr. Holt had the gun in his lap while in the car. Ms. Bryson described it as

11

Mr. Holt's gun and testified that when Mr. Holt realized they had been stopped by police, he placed the gun under the front seat. Ms. Bryson testified that before she was ordered out of the car, Mr. Holt asked her to claim possession of the gun and she refused.

Ms. Marks testified that following the police stop she, too, was asked by Mr. Holt to claim possession of the gun since she had no criminal history. Ms. Marks testified that when Mr. Holt was ordered out of the car, she heard what she thought was the gun fall out of his lap onto the ground.

After Ms. Bryson's and Ms. Marks's offers of proof, the trial court told Mr. Holt that it believed the women's testimony would be very damaging to his defense, but it was his choice whether to call them as witnesses. In both instances, Mr. Holt responded that he had not come into the courtroom "expecting to be acquitted" or "expecting acquittal." 12 RP at 682, 697. Following Ms. Bryson's testimony, Mr. Holt explained to the court that her testimony

> only bolsters my credibility with the jury because I'm going to tell them the same thing that she's telling them before she even gets a chance to tell them that. Yes, I told her to take the charge. Yes, I told the other girl to take the charge. Yes, I put the gun underneath the seat. These are things that I'm going to tell the jury.

12 RP at 682.

Mr. Holt continued with Ms. Moffatte's and Mr. Pinkney's offers of proof, but asked those witnesses very few questions. He established with Ms. Moffatte only that he "drank a lot" the night of August 16, 2016. 12 RP at 700-01.

12

Mr. Pinkney denied that he had been drinking with Mr. Holt on the night of August 16, 2016, testifying only that he "heard" Mr. Holt was drinking that night.  12 RP at 716.

Before recessing for the noon hour, the trial court explained to Mr. Holt that when the State rested its case, Mr. Holt would be invited to make his opening statement.  Mr. Holt began to explain that, "the State offered me a plea agreement," and the trial court cut him off, stating it had nothing to do with plea agreements and did not want to hear about it.  12 RP at 727.

When court reconvened at 1:30 p.m., Mr. Holt had entered into a plea agreement with the State.  The parties presented the trial court with Mr. Holt's signed statement on plea of guilty.  The prosecutor explained that the plea in this case

> is conditioned on a plea agreement that he's reached with [the prosecutor] in the trafficking [case], which will result in a plea of guilty to the original four charges and the State's recommendation of 286 months in the Department of Corrections concurrent with the sentence in this case.

12 RP at 736-37.  The prosecutor informed the court that Mr. Holt wanted assurances he could withdraw his plea if the State backed out of its agreement in the trafficking case. Mr. Holt was assured that by making a record of the State's promised recommendation in the trafficking case, he would be permitted to withdraw the plea in this case if the State reneged.

13

The trial court conducted a lengthy and thorough plea colloquy with Mr. Holt. *See* 12 RP at 740-57. When asked if anyone was threatening him or forcing him to plea, Mr. Holt responded, "that's [very] broad." 12 RP at 752. The trial court said it was not asking whether Mr. Holt was concerned about being convicted, just "whether there's somebody who's trying to force you to plead guilty in this case." *Id.* In a response on which this appeal heavily relies, Mr. Holt answered:

> Well, Your Honor, the reality of it is, part of my deciding in pleading guilty is if I don't plead guilty, I can't talk to my family. If I do plead guilty, I'll be able to talk to my family. So a part of it is that if I resolve all this, I can get off of phone restriction and be able to call my family. If I don't plead guilty, then I will probably have to go another year or two sitting in this jail in lockdown for 24 hours a day not being able to call my family. And it's messing with my mental health to be confined in a cell 24 hours a day for three years straight, and I'm losing my sanity slowly but surely, so it's like either I continue to go back to my torture chamber or I plead guilty. I mean, take what you want from that about, but nobody has put a gun to my head and said "plead guilty."

12 RP at 752. The court replied, "What I hear you telling me is that the conditions of your pretrial confinement have been tough and you would like to get out from under that." 12 RP at 753. Mr. Holt agreed and then entered his guilty plea and confirmed the plea statement. The court accepted Mr. Holt's plea and found it knowingly, intelligently, and voluntarily made.

A month later, Mr. Holt filed a motion to withdraw his guilty plea, identifying over a dozen grounds. At oral argument of the motion, Mr. Holt told the court that he sought to withdraw his plea because he had misunderstood that his crimes committed as a

14

juvenile, which appeared on his criminal history as half points, would be counted toward

his offender score. He argued in the alternative that the court should grant a continuance

so that he could make sure all of the conditions of the plea that he was seeking from the

prosecutors could be worked out. The court denied the motion and proceeded to

sentencing. Mr. Holt appeals.

ANALYSIS

Mr. Holt assigns error to the trial court's refusal to allow him to withdraw his

guilty plea.

Under CrR 4.2(f), the court must allow a defendant to withdraw his guilty plea

prior to sentencing upon a showing it is necessary to correct a manifest injustice. *In re

Pers. Restraint of Stockwell*, 179 Wn.2d 588, 595, 316 P.3d 1007 (2014). "Manifest

injustice" is "an injustice that is obvious, directly observable, overt, not obscure." *State

v. Taylor*, 83 Wn.2d 594, 596, 521 P.2d 699 (1974).

A plea that is involuntary constitutes a "manifest injustice." *Id.* at 597; *State v.

Mendoza*, 157 Wn.2d 582, 587, 141 P.3d 49 (2006). "Due process requires that a

defendant's guilty plea be knowing, voluntary, and intelligent." *Mendoza*, 157 Wn.2d at

587. CrR 4.2(d) effectuates this procedurally, providing that "[t]he court shall not accept

a plea of guilty without first determining that it is made voluntarily, competently and with

an understanding of the nature of the charge and the consequences of the plea." When, as

was done by Mr. Holt, a defendant fills out a written statement on plea of guilty in

compliance with CrR 4.2(g) and acknowledges that he or she has read it and understands it and that its contents are true, "the written statement provides prima facie verification of the plea's voluntariness." *State v. Perez*, 33 Wn. App. 258, 261, 654 P.2d 708 (1982). Further, "[w]hen the judge goes on to inquire orally of the defendant and satisfies himself on the record of the existence of the various criteria of voluntariness, the presumption of voluntariness is well-nigh irrefutable." *Id.* at 262.

Mr. Holt argues for the first time on appeal that "[t]he court's repeated and unjustified shackling of Mr. Holt coupled with his horrid jail conditions rendered his plea involuntary." Appellant' Opening Br. at 1. Relying on the Washington Supreme Court's decision in *Jackson*, filed six months after Mr. Holt entered his guilty plea, he argues that this court must "presume" that the shackling led him to plead guilty and ask whether the State has proved otherwise beyond a reasonable doubt. *Id.* at 20. Mr. Holt misapprehends what *Jackson* requires us to presume.

I.  WHEN WE PRESUME PREJUDICE IN HARMLESS ERROR ANALYSIS, WE PRESUME THE PREJUDICE AGAINST THAT WHICH THE CONSTITUTION SAFEGUARDS

One of the constitutional rights implicated when a defendant is physically restrained in court proceedings is "the right to appear and defend in person" guaranteed by article I, section 22 of the Washington State Constitution, which includes "the use of not only [the defendant's] mental but physical faculties unfettered." *State v. Williams*, 18 Wash. 47, 51, 50 P. 580 (1897). "[U]nless some impelling necessity demands the

restraint of a prisoner to secure the safety of others and his own custody, the binding of

the prisoner in irons is a plain violation of the constitution guarantee." *Id.* Restraints are

also disfavored because they may interfere with "the presumption of innocence, privilege

of testifying in one's own behalf, and [the] right to consult with counsel during trial."

*State v. Hartzog*, 96 Wn.2d 383, 398, 635 P.2d 694 (1981).

In *Jackson*, our Supreme Court clarified that protections against blanket shackling

policies apply not only to jury trials, but to nonjury pretrial proceedings as well. 195

Wn.2d at 852. It held that "[a] trial court *must* engage in an individualized inquiry into

the use of restraints prior to every court appearance." *Id.* at 854. Finally, while it

affirmed that a trial court's violation of the constitutional protections can be harmless, it

abrogated a holding in *State v. Hutchinson*, 135 Wn.2d 863, 888, 959 P.2d 1061 (1998),

that "the Defendant must show the shackling had a substantial or injurious effect or

influence on the jury's verdict." Instead, it must appear from an examination of the

record that the error was harmless beyond a reasonable doubt. *Jackson*, 195 Wn.2d

at 856.

Mr. Holt claims that these requirements set forth in *Jackson* were violated during

nine pretrial hearings taking place in the two and a half years before he was tried. In five

instances, they were. On September 10, 2018, and October 15, 2018, Mr. Holt was

restrained and the trial courts proceeded to decide other motions and continue trial

without first addressing whether the restraints were needed. These appearances were

17

within a month or two of Mr. Holt's brazen attack on Mr. Pinkney, however, and the

court's errors were harmless beyond a reasonable doubt for a reason recognized in

*Jackson.* Where Mr. Holt had so recently physically assaulted a codefendant in the

courtroom even while in restraints, the State can demonstrate that Mr. Holt would have

been required to wear restraints had the individualized inquiry been performed. *See*

*Jackson*, 195 Wn.2d at 856 n.4.

On April 17, 2019, the trial court refused to revisit an agreed January 2019

decision on restraints; this was error. On August 19, 2019, the court ruled on an

objection to restraints by deferring to "the jail's call once the Court authorizes

[restraints]," which is also error under *Jackson.* 1 RP at 120. On September 9, 2019, the

same judge conducted no inquiry. None of these rulings was made by Judge Costello.[2]

The question remains whether these three errors were harmless beyond a

reasonable doubt.

---

[2] The other violations alleged by Mr. Holt are not borne out by the record. As the
State correctly observes, there is no indication in the record that Mr. Holt was shackled
for a hearing held on October 16, 2018. On January 14, 2019, Mr. Holt agreed to the
restraints imposed and even signed off on the order. CP at 70. At proceedings on May 2,
2019, that carried over to May 3, the trial court did engage in an individualized inquiry
and relieved Mr. Holt of a restraint to his right hand. There is no indication that Mr. Holt
was restrained on January 2, 2020. Judge Costello did engage in an individualized
inquiry about the limits that would be imposed on Mr. Holt during the trial. While Mr.
Holt was in additional restraints when he appeared in court the morning of Monday,
January 13, 2020, the court did engage in an individualized inquiry, was informed about
Mr. Holt's escalating behavior, and Mr. Holt's right hand was later relieved of restraints.

The harm we presume in applying the harmless error test is the foreseeable harm

protected against by the Constitution. In the case of shackling, this can be interference

with the presumption of innocence, the privilege to testify in one's own behalf, the ability

to consult with counsel during trial, and the otherwise unfettered use of the defendant's

mental and physical faculties. *Hartzog*, 96 Wn.2d at 398; *Williams*, 18 Wash. at 51. In

*Jackson*, it was evidence that jurors would have been able to see that the defendant was

restrained by a leg brace while on the witness stand, did not stand to take his oath before

the jury, and was not seen walking to or from the jury box: what the court described as

"clear inferences of dangerousness that [could] be drawn by the obvious limitations

placed on [the] movement" of a defendant charged with domestic violence. 195 Wn.2d at

857-58.

Mr. Holt does not articulate, as Mr. Jackson did, how the several instances of

pretrial interference with his unfettered use of his physical faculties could have

prejudiced him in his prosecution. Instead, he argues that "[b]ecause the State cannot

prove the court's errors [did not] contribute[ ] to Mr. Holt's decision to plead guilty . . .

this Court should reverse." Appellant's Reply Br. at 1.[3] We reject this as a statement of

the standard of review. Not only does it presume that Mr. Holt was prejudiced by the

---

[3] Mr. Holt also contends that the State failed to show that the shackling errors did not influence the court's sentence, *see* Appellant's Reply Br. at 1, but Mr. Holt did not assign error to, nor could he appeal, his standard range sentence. RCW 9.94A.585(1).

plea agreement, it places a premium on his self-serving position about what contributed to his decision to plead guilty.

Whether a constitutional error is harmless is an objective, not subjective test. In the case of a conviction, it is whether "the appellate court is convinced beyond a reasonable doubt that any reasonable jury would have reached the same result in the absence of the error," or, conversely, whether "the untainted evidence is so overwhelming that it necessarily leads to a finding of guilt." *State v. Guloy*, 104 Wn.2d 412, 425-26, 705 P.2d 1182 (1985). In this case, because the State was prepared to rest its case and Mr. Holt's witnesses had all been presented through offers of proof, we can assess whether Mr. Holt has demonstrated that the pretrial restraints could have affected the outcome of trial and by extension, the decision whether to plead guilty. Given the evidence and Mr. Holt's announced intention to tell jurors he had placed the firearm under the front seat and asked both Ms. Bryson and Ms. Marks to take the charge, completing trial would necessarily have led to a finding of guilt. By entering into the plea agreement, Mr. Holt obtained the State's assurance that it would ask for concurrent sentencing of the firearm charge and Mr. Holt's other pending charges. Under the only reasonable, objective application of the constitutional harmless error standard, the pretrial shackling errors were harmless.

II.     MR. HOLT FAILS TO DEMONSTRATE THAT HIS PLEA WAS NOT VOLUNTARY

Mr. Holt relies on his alleged mental and emotional infirmity to argue that his

guilty plea was not voluntary.  Where a defendant suggests he or she was not competent

to voluntarily and intelligently plead guilty

> "[t]he trial court is vested with broad discretion in judging the mental
> competency of every defendant to plead guilty and may make its
> determination from many things, including the defendant's appearance,
> demeanor, conduct, personal and family history, past behavior, medical
> and psychiatric reports, and the statements of counsel."

*State v. Osborne*, 102 Wn.2d 87, 98, 684 P.2d 683 (1984) (quoting *State v. Loux*, 24 Wn.

App. 545, 548, 604 P.2d 177 (1979)).  The standard is "'whether the plea represents a

voluntary and intelligent choice among the alternative courses of action open to the

defendant.'"  *Id.* at 98 (quoting *North Carolina v. Alford*, 400 U.S. 25, 31, 91 S. Ct. 160,

27 L. Ed. 2d 162 (1970)).

Mr. Holt did not support his motion to withdraw his plea with any third party or

documentary evidence or, for that matter, even sworn testimony of his own.  Appellate

counsel makes much of Mr. Holt's statement during the plea colloquy about conditions

and restrictions imposed by the jail, but provides no evidence of those conditions other

than the record establishing that the phone restrictions were the result of Mr. Holt

misusing other offenders' PINs to conduct illegal activity.  A plea of guilty is not

involuntary where the decision to plead is a calculated move on the defendant's part to

21

avoid what he considers to be a worse fate. *State v. Ridgley*, 28 Wn. App. 351, 623 P.2d

717 (1981).

Neither in his written or oral argument did Mr. Holt ever base his motion to

withdraw his guilty plea on pretrial shackling by the courts.

Judge Costello had an extensive opportunity to assess Mr. Holt during the week-

long trial and other proceedings. He observed that he had "not heard anything" about

mental health or emotional issues until the motion to withdraw the plea was filed, adding,

"I see this as a ploy for additional time as an effort to inject something poisonous into this

record." 16 RP at 20.

The record clearly demonstrates a complete and comprehensive plea colloquy and

that Mr. Holt freely entered into a plea agreement with the State. There is no manifest

injustice to remedy in this case.

## STATEMENT OF ADDITIONAL GROUNDS

In a pro se statement of additional grounds, Mr. Holt raises two. In the first, he

makes further claims of a history of mental health problems and alleges he was hearing

voices at the time he entered his guilty plea. The contention that his plea was involuntary

because of mental and emotional issues was advanced by appellate counsel. As already

discussed, Mr. Holt fails to demonstrate an abuse of the trial court's discretion in finding

that his guilty plea was voluntary.

22

In the second, Mr. Holt complains about phone restrictions imposed by the jail but fails to identify any particular ruling by a court, or why it was error. We are unable to consider a ground that does not adequately identify the nature and occurrence of alleged errors. RAP 10.10(c).

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Siddoway, C.J.

WE CONCUR:

Lawrence-Berrey, J.

Pennell, J.

APPENDIX

Mr. Holt was allowed to question the witnesses directly and the prosecutor was permitted to cross-examine.

Angelica Bryson testified in relevant part as follows:

Q      . . . Do you remember what happened on the night of—do you remember being at the bowling alley at the night of the arrest?

A      At the night what?

Q      Of the arrest.

A      Yes.

Q      Can you tell the judge what happened that night?

A      That you guys were drinking in the parking lot.

Q      Who's "you guys"?

A      You, Shy-shy.  Jesslyn I think was there, and I was there.

Q      Was Kayleigh and Pinkney there?

A      I don't remember.

Q      Do you remember how many cars were in that parking lot that day?

A      Two, I think.

Q      The blue one and the white one?

A      I don't know.

Q      Do you know how much I was drinking that night?

A      A lot.

Q      More than a half a gallon you think?

A      Yeah, probably.

Q      I was pretty much blackout drunk after that, right?

A      Well, you weren't like blackout drunk, but yeah.

Q       How drunk do you think I was?

A       You were pretty drunk, like slurring your words, that drunk.

Q       Stumbling?

A       Yeah.

Q       You said more than a half gallon.  You think about a full gallon?

A       I don't know.

Q       Pretty close to it?

A       I don't know.

. . . .

Q       . . . As we were getting pulled over later on, did you wake me at some point while we were getting pulled over and tell me we were getting pulled over?

A       Yeah.

Q       And I was asleep since I got in the car?

A       Well, yeah.  You did wake up a couple times, but yeah.

Q       Do you remember what I did when I woke up?  Was I like coherent when I woke up?

A       Yeah.

Q       But you don't remember me saying anything or anything like that?

A       What do you mean?

Q       Like when I woke up, did I say anything or do anything?

A       When we were getting pulled over?

Q       No, no, no, no.  In-between getting in the car and the pullover?

A       No, I don't remember.

Q       All right.  What happened after the pullover?

A       You put the gun under the seat.

Q       Was the gun at the floorboard or was it at any point in time—at any point in time was the gun in-between my legs on the feet; do you remember?

25

A      On the floor?

Q      Yeah.

A      I don't remember. I know it was in your lap and then when we were getting pulled over, you put it under the seat.

Q      Is there a possibility that it could have been at my feet at any point in time?

A      I don't know.

Q      And the last question I have is, Jesslyn told you the clip fell from my lap, but you didn't see it yourself, or did you?

A      No, I didn't see it.

. . . .[4]

Q      Did the officers ask you to search the car when you very first got out of the car?

A      Yes.

Q      And what did you say?

A      I said yes.

Q      Did I get—when I got put into the white car, was I coming from the blue car? Do you remember the blue car?

A      Yes.

Q      So I was coming from the blue car when I got put in the white one, right?

A      Yes.

Q      One last time. I know I asked this question earlier, but I want to make sure that I ask it. You said I was slurring my words and that I was stumbling, right?

A      Yes.

---

[4] At this point, and later in questioning Ms. Marks, Mr. Holt asked about whether Ms. Bryson suggested calling police and Ms. Marks threatened to tell Mr. Holt about it. Both witnesses disclaimed any memory of this.

. . . .

That's all I got.

THE COURT: Thank you.

[Addressing the prosecutor: I]f you have questions, you may inquire.

[THE PROSECUTOR]:

Q    Ms. Bryson, how long before you got pulled over by the police had Mr. Holt gotten into the car with you?

A    Probably like an hour, an hour and 30 minutes.

Q    And what had you guys been doing in the hour and 30 minutes?

A    We were just driving back.

Q    From the bowling alley to the motel?

A    Yeah.

Q    Did Mr. Holt have his gun with him when he went from the blue into the white car?

A    Yes.

Q    Had you seen him with that gun that day?

A    Yes.

Q    Had you seen him—when he got into the white car, how did he get into it?

A    Well, Shy-shy had to help him a little bit. He was stumbling.

Q    He was intoxicated from what you saw?

A    Yes.

Q    A lot of the time when you were with Mr. Holt those days was there alcohol involved?

A    Yes.

Q    So when Mr. Holt got into the white car, he had his gun with him?

A    Yes.

. . . .

Q       When Mr. Holt was in the white car with you, you drove the whole time?

A       Yes.

Q       Ms. Marks was in the back seat?

A       Yes.

Q       Mr. Holt had his gun on his lap?

A       Yes.

Q       Did you see him playing with it at all during the time you were driving around?

A       No.

Q       What was he doing with it?

A       It was just sitting in his lap.

Q       And you said that at some point he was asleep during that trip?

A       Yes.

Q       When the police lit you up, you were in a parking lot at the Shell station, right?

A       Yes.

Q       And they ordered all you guys to get out of the car?

A       They ordered me to get out of the car first.

Q       Before that, when you're stopped there, did Mr. Holt say anything about the gun?

A       No.  He just put it under the seat.

Q       Could you tell whether or not he knew that the police were behind you at that time?

A       Yes, he knew.

Q       How do you know?

A       The look on his face.  I told him the police were behind us.

Q       You said to him "the police are behind us"?

A       Yeah.  I said, "We're getting pulled over."

Q    And could you see all the red and blue flashing lights around you when you were saying that?

A    Yes.

Q    And Mr. Holt's eyes were open?

A    Yes.

Q    So once that happened, he took the gun from his lap and he put it under the seat?

A    Yes.

Q    Did you see which hand he did that, by any chance?

A    No.

Q    How much do you know about that gun?

A    Not a lot.

Q    Had you had ever held it?

A    No.

Q    That was Mr. Holt's gun?

A    Yes.

Q    At any point before you got out of the car did Mr. Holt ask you whether or not you would take the gun charge for him?

A    No.

Q    No, he didn't?

A    I think—

      THE DEFENDANT: Objection; leading.

      [THE PROSECUTOR]: Yes, it is, Judge.

      THE COURT: Overruled.  He may lead.

A    I think so, yeah.

Q    (By [the prosecutor]) Did he also ask Jesslyn to take the gun charge for him?

A    I don't know; I was out of the car.

Q      When he asked you to take the gun charge for him, what did you say?

A      "No."

Q      Did you tell him why?

A      I just said I couldn't.

Q      Did he argue with you about it?

A      No.

Q      When he asked you if you would take the gun charge for him, did you understand what he was saying?

A      Yes.

Q      Was that before or after he put the gun under the seat?

A      After.

Q      And you did not see where the magazine was at any point in time?

A      No.

Q      You just saw him put the gun under the seat?

A      Yes.

Q      When he did that, did he lean forward to do it or just reach down?

A      Just reached down.

Q      You got out of the car first?

A      Yes.

Q      Did you see him getting out of the car?

A      No.  I couldn't.

Q      You weren't in a place where you could see him?

A      Yeah.  I was in the back of the cop car.

Q      Since that time—sorry; since—well, yeah.  Since that time has Mr. Holt ever spoken to you about this gun case personally?

A      No.

Q      Not once?

A No.

Q You don't know—do you know where the gun came from that he had sitting in his lap when he went from the blue car to the white car?

A No.

Q Just that he had it with him when he got into the car with you?

A Yes.

Q And had it the entire time until he put it under the seat when the police were behind him?

A Yes.

  [THE PROSECUTOR]: Thank you, Ms. Bryson.

 I don't have anything else, Judge.

12 RP at 663-673. In redirect questioning, Mr. Holt asked Ms. Bryson about the most

recent time they saw each other and what they had discussed; she could not recall.

In Jesslyn Marks's offer of proof, she testified as follows:

Q (By the defendant) Do you recall if I was intoxicated the night of 2016 when we were pulled over?

A I don't know.

Q You don't know?

A No, I don't.

Q Were you intoxicated that night?

A Yes, I was.

Q Were you high off cocaine that night?

A Yes, I was.

Q Was I partaking in the cocaine and the alcohol with you?

A Yes, you were.

Q      So I was intoxicated?

A      I don't know how intoxicated, but you weren't there the whole day, so I don't know.

Q      When you were drinking, do you remember how much you were drinking that I was partaking in this drinking with you?

A      No, I don't remember.

Q      Do you know if it was more than one or two bottles?

A      A bottle at the most.

Q      Do you remember how much cocaine it was that we were partaking in?

A      No, I don't.

Q      Do you know if I had been drinking earlier in the day before the bottle?

A      No, I don't know.

Q      And you can't recall how intoxicated I was or I wasn't?

A      No.

Q      Do you remember if you and Ms. Bryson had to physically put me into the vehicle that I was in?

A      No.

Q      Would you remember if you had done that?

A      Yeah.

Q      Before I was placed into the Malibu, did I come from the blue car?

A      I don't know where you came from.

Q      Did you tell Ms. Bryson that you would tell her—you would tell me if she was attempting to call the cops in-between the car ride?

A      No.

Q      I just got one more question for you.  As a matter of fact, let's go back.  Can you tell us what happened that night?  Do you remember everything that happened?

A      I remember being in a hotel room, you and Angelica showing up in the Malibu. We left. You were laid back in the seat, driving down the road. We were somewhere over by Hosmer and I-5. We were in a hotel next to Hooters. You were laid back in the seat. You had the gun on your right lap, and Angelica was driving. We got pulled over at a gas station. Cops surrounded us. We were asked to exit the vehicle. The vehicle got towed and we got arrested.

      THE COURT: Make sure you slow down a little bit here for the court reporter.

      THE WITNESS: Yes. I'm so sorry.

Q      (By the defendant) Did I tell you anything in-between the car ride or before getting pulled over?

A      No.

Q      So no words were spoken at all?

A      No.

Q      The last question: Do you remember what kind of alcohol we were consuming?

A      Ciroc vodka, if you really want technical.

      THE DEFENDANT: Nothing further for this witness, Your Honor.

      THE COURT: [Inviting cross-examination].

By [THE PROSECUTOR]:

Q      Good morning, Ms. Marks.

A      Good morning.

Q      During the 10 or 15 minutes before you were contacted by the police on the night of August 15th into the 16th of 2016, who else was in the car, the white Malibu?

A      The night that we got pulled over? It was me, Matthew, and Angelica.

Q      "Matthew" means Mr. Holt?

A      Yes.

Q     Angelica was driving?

A     Yes.

Q     You were in the back seat?

A     Yes.

Q     And Mr. Holt was in the passenger seat, front?

A     Yes, sir.

Q     The entire time?

A     Yes.

Q     You saw the gun on Mr. Holt's lap?

A     Yes.

Q     Was it ever anywhere else inside the car that you saw?

A     No, not that I know.

Q     When you got—how did you become aware that the police were contacting you guys?

A     I wasn't aware that the police were contacting us.  I had no idea of any police involvement until that night that we had gotten pulled over.

Q     What I mean is, once you got pulled over at the gas station, how did you know that the police were behind you?

A     Well, I saw flashing lights.  They were yelling to get out of the car with our hands up, walk backwards.

Q     How long do you think you were in the car, you and Mr. Holt and Ms. Bryson, before any of the three of you got out of the car?

A     With driving?

Q     No, just from—

A     Just a couple minutes.  Maybe five at the most.

Q     Do you recall who got out of the car first?

A     I believe it was Angelica.

Q     Before Ms. Bryson got out of the car did Mr. Holt ask Ms. Bryson to take the gun charge for him?

A     We were talking about taking the—who would take the gun charge.

Q     Tell us about that.

A     So we were all—I was like kind of asleep from being drunk and high and I was kind of fuzzy still, so when I had woken up and I saw the lights behinds us and the gun was on his lap, he started kind of—Mr. Holt started kind of freaking out; Angelica was kind of freaking out. We all were, you know; like we didn't know what was going on. At least I really wasn't sure what was going on. So they had started debating on who was going to take the gun charge. They both looked at me because I don't have any—I've never had a record, never had a felony, and so my charges, I guess, technically would be less than his or hers compared to the past that they've had.

Q     So who asked you whether or not you would take the gun charge?

A     It wasn't like a direct "will you take the gun charge;" it was more of like going about it in a roundabout way and just like talking about it, and they kind of pointed the finger towards me.

Q     Are you talking about Mr. Holt and Ms. Bryson?

A     Yes.

Q     So what was their conversation from which you took that they wanted you to take the gun charge?

A     I don't remember the exact conversation. It was just some words that were exchanged. They looked at me. I never had a record, and that was about it. I didn't take it. I was like, oh, that night with Angelica.

Q     Say that last thing again.

A     I said they wanted me to take it. I didn't take it. I don't remember exact conversations. After that they talked to me. The officers had came up and talked to me and asked me whose the gun was. I said, "I don't know exactly whose it is, but it was sitting on his lap." And, you know—and then after that we had just been let go.

35

Q       Do you recall hearing any noises or anything falling to the ground
        when Mr. Holt got out of the car?

A       I heard the gun drop from his lap.

Q       Tell us about that.

A       Well, I was in the back of the police car.  Maybe I was in the car.
        I'm not sure.  I'm still kind of fuzzy on details; you know, there was
        a lot going on.  But I know for sure that when he got up, I heard the
        gun slam down to the ground.

Q       Outside of the car?

A       Yes.

                [PROSCEUTOR]: Thank you, Ms. Marks.

        That's all I have, Judge.

12 RP at 688-94.  Mr. Holt's only redirect examination of Ms. Marks was to ask her if

she and Ms. Bryson had received a courtesy ride back to their motel from officers, which

she said they did.  *Id.* at 695.  (Ms. Bryson had denied getting a ride from officers.)